# United States Court of Appeals
## For the First Circuit

No. 10-1208

DAVID MORGAN,

Petitioner - Appellant,

v.

THOMAS DICKHAUT, Superintendent,
Souza Baranowski Correctional Center,

Respondent - Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael Ponsor, U.S. District Judge]

Before

Torruella, Lipez, and Howard,
Circuit Judges.

Catherine J. Hinton, with whom Rankin & Sultan was on brief, for appellant.
Amy L. Karangekis, Assistant Attorney General, with whom Martha Coakley, Attorney General, was on brief, for appellee.

April 27, 2012

**LIPEZ, Circuit Judge**. In this appeal arising from a 28 U.S.C. § 2254 petition, David Morgan challenges his Massachusetts state court conviction of first degree murder. Morgan argues that the district court erred in dismissing his petition because the Massachusetts Supreme Judicial Court ("SJC") applied a beyond a reasonable doubt standard contrary to that articulated by the Supreme Court in Jackson v. Virginia, 443 U.S. 307 (1979), in evaluating his claim that there was insufficient evidence presented at trial to support his conviction. Alternatively, Morgan argues that, even if the SJC applied the correct standard, it did so unreasonably, because the evidence presented against him was insufficient to establish his guilt beyond a reasonable doubt. We reject these arguments and affirm the district court's dismissal of Morgan's petition.

**I.**

**A. Factual Background**

Morgan does not dispute the SJC's account of the facts of this case, which we set forth almost in full below. We do so because the import of Morgan's sufficiency argument, which presents a closer question than some such arguments, cannot be understood without a full statement of the facts. Before doing so, however, we offer a brief introduction to the circumstances of the case and the individuals involved for clarity's sake.

Morgan and Wayne Rowe, the victim, as well as many of the witnesses in this case, were involved in the marijuana trade in and around Springfield, Massachusetts in early 1999. After the theft of marijuana and money from his apartment, Morgan suspected that Rowe was responsible and told several individuals of his suspicion and his intent to retaliate. The prosecution argued that this burglary provided a motive for the crime and offered several witnesses who implicated Morgan in the murder. Errol Lodge, a sometime customer of Morgan and Rowe, testified that he saw Rowe get into a car with Morgan and an associate, Floyd Johnson, on the day that Rowe disappeared. Richard McLean, a local business owner and an acquaintance of both Morgan and Rowe, testified that Morgan stated his intent to kill Rowe two days before Rowe's disappearance, and that Morgan made statements after the killing suggesting that he was responsible. Additionally, the prosecution offered several other witnesses, including Rowe's wife, who testified that Morgan made general threats to harm the person who broke into his apartment and specific threats to harm Rowe.

With that brief introduction, we turn to the SJC's recitation of the facts.

> The victim was last seen in the late afternoon of March 3, 1999, getting into a four-door green sedan with the defendant[, David Morgan,] and Floyd Johnson, who was driving. He was not seen again until his body was recovered in Agawam, at the edge of the Connecticut River, on April 18, 1999. When his body was found the victim was wearing some

-3-

of the same clothing he was wearing on March 3. He had suffered a gunshot wound to the head at close range. The medical examiner was able to recover the projectile, a .38 caliber metal jacket that could have been fired from a .357 Magnum or specific types of nine millimeter weapons.

In the days before his disappearance and murder, the victim was living in the basement of a residence in Springfield apart from his wife and children. The victim's wife testified that, on March 1, 2, and 3, 1999, after work, she picked up the victim and drove him to the defendant's apartment so that the victim could obtain marijuana to sell. The wife would drop the victim off at his residence each evening. On March 1, 1999, when the victim's wife took him to the defendant's apartment, the defendant approached the victim, who was sitting in the vehicle's passenger seat, and told him that his apartment had been broken into and that whoever had anything to do with it was "going to feel it."

On March 3, after his wife had brought the victim to the defendant's apartment, she dropped him off at his residence at approximately 5 P.M. Sometime after that, Errol Lodge wanted to purchase marijuana from the victim. The victim invited Lodge to come to his residence and wait in the driveway for a delivery of marijuana. Lodge saw the defendant and Johnson pull up in a green sedan, and he saw the victim speak to the men and then get into the back seat of the vehicle, which sped away. Lodge waited for the victim for a while but left when he did not return.

In statements to police, the defendant did not deny that Johnson drove him in a green sedan to the victim's house between approximately 4 P.M. and 5 P.M. that afternoon. The defendant claimed that he and Johnson went there to pick up money the victim owed and that, once they did so, the pair

-4-

left.  The defendant also told police that the victim could not be trusted because he would "rob you."

At about 8:30 P.M. the evening of March 3, the victim's wife tried contacting him by his pager and received no response, which was uncharacteristic.  She tried several times that evening and in the days following, still receiving no response.  She went to the victim's residence, and also searched for the victim for several days, before reporting him as a missing person on March 8.  The victim's cellular telephone records showed no outgoing calls after March 3.

No physical evidence tied the defendant to the victim's murder.  The gun was never found, and a search of the green sedan Johnson was driving, which was routinely cleaned, turned up no fingerprints that matched the victim's.  A test of the vehicle yielded the possible presence of human blood on the rear exterior door handle on the driver's side.  The defendant's conduct and statements he made to others both before and after the victim's disappearance implicated him in the murder.

1.  Errol Lodge.  After the break-in of his apartment, the defendant told Lodge what had happened and that he knew who did it; pulling a gun from his waist, he said that Lodge "will hear about the person."  On March 3, five days before the wife reported the victim missing, the defendant telephoned Lodge at home and, uncharacteristically, kept him on the line for two hours.  In the course of the conversation, which was interrupted with the defendant's putting Lodge on hold and instructing him not to hang up, the defendant told Lodge that he had dropped the victim off "somewhere" and "cannot find [the victim]"; the victim's "wife reported him missing"; and "people said I killed him."

When the defendant and Lodge were arrested in June, 1999, on charges of selling marijuana, the defendant told Lodge, "[y]ou

cannot become an informant. You only charged for weed and weed is a misdemeanor. I will get you out. Don't tell them nothing. Don't tell them nothing." In addition, the defendant gave money to Lodge's girl friend so she could move and paid for an attorney who visited Lodge in jail three or four times. After Lodge's arrest, the defendant kept in contact with Lodge's girl friend, something he had not done before. The telephone calls between the defendant and Lodge's girl friend continued until September, 1999. The defendant was supposed to meet the girl friend to talk because he knew Lodge was talking to police officials and was going to testify against him. The defendant never showed up.

2. <u>The victim's wife</u>. At some point during her search for the victim, his wife confronted the defendant, who told her that he did go by the victim's house on March 3, but that the victim did not get into the car with him. After speaking to more individuals, the wife later told the defendant that she knew he lied because she had a witness who saw the victim getting into the car with him. The defendant started yelling at her and told her to bring the witness to him; when the wife said that she was going to the police, the defendant stated, "[g]o to the cops because you can't prove nothing anyways."

3. <u>Richard McLean</u>. Richard McLean testified that, before the victim's murder, the defendant and Johnson met with him and showed him a nine millimeter weapon in Johnson's possession; the defendant also possessed a gun. The defendant told McLean that he was going to kill the victim. McLean told the defendant to forget about it, and the defendant responded that if no one saw him do it, there was nothing anyone could do. McLean testified that the defendant also stated, "[a]s a matter of fact that mother fucker gonna be dead in a week anyway."

Two days after the victim disappeared, the defendant met McLean and tried to buy a

gun McLean was holding for the victim. McLean asked the defendant why he needed a gun, given that he had seen the defendant's gun. The defendant stated that he needed a "clean gun" because people associated with the victim were after him. When McLean resisted giving him the victim's gun, the defendant stated, "[w]ell, you don't have to worry about [the victim], because [you will] never see [him] again. . . . Trust me. You will never see [the victim] again." Sometime later, the defendant told McLean that the gun that was used to kill the victim was a nine millimeter. In September, 1999, McLean had conversations with the defendant on at least two occasions. In the first conversation, the defendant told McLean that Lodge was going to testify against him for the victim's murder, because Lodge witnessed the victim's departure with the defendant and Johnson the day the victim disappeared. McLean testified that he stated, "[y]ou guys pick up somebody to kill him and somebody there seen, and you guys still do it? You guys got to be stupid." McLean testified that the defendant did not say anything in response; instead, he laughed. McLean also testified that, in the second conversation, the defendant told him that he was feeling "fucked up" because he learned that the victim was not the one who had broken into his apartment and that the victim died for the wrong reason.

4. <u>Warren Smith</u>. Warren Smith testified that he had seen the defendant with a .45 caliber gun, a .357 Magnum, and a nine millimeter German Luger. He also testified that, during a discussion between Smith, the victim, and the defendant concerning marijuana the defendant allegedly owed the victim, the defendant waved a .45 caliber gun around and stated that if the victim or anybody else tried to rob him, he would kill them. At some point the defendant also bragged to Smith that he shot at an individual who owed the defendant money for marijuana.

> 5. <u>Jailhouse witnesses</u>. The
> Commonwealth also called two witnesses whom
> the defendant met while he was incarcerated.
> One testified that the defendant told him that
> he was "going down" for a murder but he was
> going to "bring it to trial and try to beat
> it."
>
> . . .
>
> The defendant did not testify at trial. His
> strategy was to attack the Commonwealth's
> case, including impeaching the credibility of
> the Commonwealth's witnesses through cross-
> examination. He also called three witnesses.
> The first was the defendant's good friend and
> landlord, a woman who owned a four-door green
> Acura automobile that she let the defendant
> drive. She stated that the defendant was not
> that upset about the break-in of his
> apartment. The second witness had been doing
> carpentry work at the defendant's apartment in
> March, 1999, and had told police that the
> defendant was home for the critical time
> period when the victim disappeared. However,
> at trial, he testified that he was not sure of
> the exact date he was at the defendant's
> apartment. The third witness was a teenaged
> boy. The victim was staying in the basement
> of his house. He saw a dark green car on what
> he believed was the day the victim
> disappeared, but when police showed him both
> Johnson's girl friend's and the defendant's
> landlord's vehicles, he could not positively
> identify either one.

Commonwealth v. <u>Morgan</u>, 868 N.E.2d 99, 103-06 (Mass. 2007) ("<u>Morgan</u>

<u>I</u>") (footnotes omitted).

To summarize, the prosecution presented no physical

evidence linking Morgan to the crime. However, there was extensive

circumstantial evidence tending to show Morgan's guilt. This

evidence included: 1) Morgan's general threats to kill the person

who burglarized his apartment, 2) Morgan's specific threats to kill Rowe, 3) testimony that the last time Rowe was seen alive he was getting into a car with Morgan and Johnson, 4) testimony that Morgan knew Rowe was missing and identified the murder weapon as a 9 millimeter gun before this information was widely known, 5) testimony that while both Morgan and Johnson had weapons prior to the murder, Morgan needed a "clean" gun after the killing, and 6) numerous statements by Morgan indicating a consciousness of guilt.

## B. Procedural History

Morgan, along with Floyd Johnson, was indicted for murder and conspiracy to commit murder. The trial judge granted an unopposed motion to sever Johnson's trial from Morgan's during the jury selection process, and the Commonwealth eventually entered a nolle prosequi of Johnson's murder indictment.[1] Morgan proceeded to a jury trial. Significantly, the prosecution declined at trial to advance a theory of joint venture and instead insisted that Morgan was the principal, meaning that he himself pulled the trigger and killed Rowe.[2] At the close of the Commonwealth's case,

---

[1] A third individual was also indicted with Morgan and Johnson, but his trial was similarly severed. This individual died prior to his trial, and evidence regarding him was deemed largely inadmissible at Morgan's trial. Accordingly, he plays no role in this appeal.

[2] The district court noted that the facts of this case "make the Commonwealth's decision to forego an alternative joint venture theory inexplicable." Morgan v. Dickhaut, 677 F. Supp. 2d 424, 439 n.10 (D. Mass. 2010) ("Morgan II"). That prosecutorial decision gives rise to the sufficiency issue addressed here.

Morgan moved for a finding of not guilty, arguing that the evidence was insufficient to permit the jury to return a guilty verdict. The motion was denied. The jury convicted Morgan of deliberately premeditated murder in the first degree.

Morgan appealed. While that appeal was pending, he filed a motion for a new trial in 2004 that was denied by the trial judge. Morgan appealed that denial, and his two appeals were consolidated.

In 2007, the SJC affirmed Morgan's conviction and the denial of his motion for a new trial. Morgan then filed a habeas petition pursuant to 18 U.S.C. § 2254 with the United States District Court for the District of Massachusetts, seeking relief on four grounds: 1) the Commonwealth's evidence was insufficient to support his conviction, 2) he received ineffective assistance of counsel, 3) there was significant prosecutorial misconduct during his trial, and 4) he was denied his right to cross-examine witnesses. In a lengthy and carefully reasoned decision, the district court found Morgan's arguments unavailing and dismissed his petition. However, the district court granted a certificate of appealability as to Morgan's claim that the evidence was insufficient to support his conviction on a theory of principal

liability.[3]  Morgan's application to this court for an expanded

certificate of appealability was denied.

Morgan raises two related arguments concerning the

sufficiency of the evidence supporting his conviction:  1) in

evaluating his sufficiency of the evidence argument, the SJC

applied a beyond a reasonable doubt standard that was contrary to

the Supreme Court's decision in Jackson, and 2) even if the SJC

identified the correct Jackson standard, the standard was

unreasonably applied.  With regard to the latter argument, Morgan

asserts that even if there was sufficient evidence to convict him

under a joint venture theory, the evidence was insufficient to

allow the jury to determine that he, as opposed to Floyd Johnson,

was the principal actor in the murder, i.e., the one who pulled the

trigger.

## II.

### A.  The AEDPA Standard

A district court's decision to deny or grant a habeas

petition under 28 U.S.C. § 2254 is subject to de novo review.

O'Laughlin v. O'Brien, 568 F.3d 287, 298 (1st Cir. 2009).  Pursuant

to the Antiterrorism and Effective Death Penalty Act of 1996

---

[3] The district court found the sufficiency of the evidence
issue presented by Morgan's petition to be a close question.  In
its conclusion, the district court stated that "[p]etitioner's
extraordinarily powerful memorandum and vigorous arguments have
given the court much food for thought and required a longer time
for consideration, and a lengthier memorandum, than is usual for a
habeas petition."  Morgan II, 677 F. Supp. 2d at 445.

("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), a successful claim for relief pursuant to § 2254 must show that the challenged state court adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or that the decision "was based on an unreasonable determination of the facts," id. at § 2254(d)(2). As noted, Morgan does not challenge the state court's fact-finding. Instead, he focuses on the "contrary to" and "unreasonable application" prongs of § 2254(d)(1).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court distinguished between the "contrary to" and "unreasonable application" prongs of the statute. It explained that a state court decision is "contrary to" established law when it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Id. at 413. In contrast, the Court stated that "a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see also Hurtado v. Tucker, 245 F.3d 7, 15 (1st Cir. 2001) (noting distinction made in Williams).

In considering the "unreasonable application" prong of § 2254(d)(1), the Supreme Court has emphasized that reasonableness must be determined according to an objective standard. Williams, 529 U.S. at 409-10. Furthermore, because the statute uses the word "unreasonable," as opposed to "erroneous" or "incorrect," a state court's application of federal law must go beyond simple error to justify issuance of the writ of habeas corpus. Id. at 411. Thus, "'some increment of incorrectness beyond error is required.'" O'Laughlin, 568 F.3d at 299 (quoting McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002)). "The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." Id. Although the concept of unreasonableness is admittedly "difficult to define," Williams, 529 U.S. at 410, it is fair to say that "if it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application" of federal law, McCambridge, 303 F.3d at 36.

Thus, as we have explained, "[h]abeas review involves the layering of two standards. The habeas question of whether the state court decision is objectively unreasonable is layered on top of the underlying standard governing the constitutional right asserted." O'Laughlin, 568 F.3d at 299 (internal quotation marks omitted). We turn next to the constitutional right at issue here.

## B. **Jackson's** **Sufficiency of the Evidence Standard**

In Jackson, the Court explained that a habeas court is not to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." 443 U.S. at 318-19 (internal quotation marks omitted). Rather, the proper inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. In applying the Jackson standard, not only must all evidence be examined in the light most favorable to the prosecution, but so must "inferences that may be reasonably drawn from it." United States v. Andujar, 49 F.3d 16, 20 (1st Cir. 1995). Accordingly, "the reviewing court . . . [must] resolve[] all credibility issues in favor of the verdict." Id. Additionally, the reasoning employed by the state court is irrelevant, and "[t]he question whether the evidence is constitutionally sufficient is . . . wholly unrelated to the question of how rationally the verdict was actually reached." Jackson, 443 U.S. at 319 n.13.

We have previously noted that "[t]he Jackson standard is as easy to articulate as it is difficult to apply." O'Laughlin, 568 F.3d at 300. However, despite the imprecision inherent in the term reasonable doubt, we have attempted to describe the level of certainty necessary to support a criminal conviction. In doing so,

we have explained that "beyond a reasonable doubt does not require the exclusion of every other hypothesis; it is enough that all reasonable doubts are excluded." O'Laughlin, 568 F.3d at 301 (quoting Stewart v. Coalter, 48 F.3d 610, 616 (1st Cir. 1995)(internal quotation marks omitted)). Accordingly, a conviction may be supported by circumstantial evidence alone. Id. While "guilt beyond a reasonable doubt cannot be premised on pure conjecture. . . .[,] a conjecture consistent with the evidence becomes less and less a conjecture, and moves gradually toward proof, as alternative innocent explanations are discarded or made less likely." Id. (internal quotation marks omitted).

However, there are limits to the probative value of circumstantial evidence, and "we are loath to stack inference upon inference in order to uphold the jury's verdict." United States v. Valerio, 48 F.3d 58, 64 (1st Cir. 1995). Thus,

> if the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction. This is so because where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury must necessarily entertain a reasonable doubt.

O'Laughlin, 568 F.3d at 301 (alterations omitted) (quoting United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir. 1995)).

In determining when such doubts must necessarily exist, we have identified certain guidelines by which to evaluate sufficiency of the evidence challenges raised under § 2254(d)(1)'s "unreasonable application" prong:

> (1) The focus of the inquiry is on the state court decision;
>
> (2) Even with the deference due by statute to the state court's determinations, the federal habeas court must itself look to "the totality of the evidence" in evaluating the state court's decision;
>
> (3) The failure of the state court to consider at all a key argument of the defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable;
>
> (4) The failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable; and
>
> (5) The absence of cases of conviction precisely parallel on their facts does not, by itself, establish objective unreasonableness.

O'Laughlin, 568 F.3d at 304 n.22 (quoting Hurtado, 245 F.3d at 18).

Finally, although we must reach our own conclusion on the petitioner's constitutional claims, we have emphasized "the great degree of deference state court judgments are due, especially those that uphold jury verdicts." Id. at 300. Accordingly, "[w]hen the record is fairly susceptible of two competing scenarios, the choice between those scenarios ordinarily is for the jury." United States

-16-

v. _Dwinells_, 508 F.3d 63, 74 (1st Cir. 2007); _see_ _also_ _United_ _States_ v. _Guerrero-Guerrero_, 776 F.2d 1071, 1075 (1st Cir. 1985) ("[T]he jury is free to choose among varying interpretations of the evidence, as long as the interpretation they choose is reasonable.").

## C.  Massachusetts Elements of First Degree Murder

In Massachusetts, first degree murder is "committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life." Mass. Gen. Laws ch. 265, § 1.  A defendant in Massachusetts may be convicted of first degree murder under a theory of either principal liability or joint venture.  In order to convict a defendant under a principal liability theory, the evidence, "by any reasonable interpretation . . ., [must show that] the alleged perpetrator has himself committed all elements of the crime."  _Commonwealth_ v. _Santos_, 797 N.E.2d 1191, 1199 n.6 (Mass. 2003).  When the crime charged is first degree murder and the killing is alleged to have been committed with a firearm, a principal liability theory requires that the prosecution prove that the defendant actually pulled the trigger to kill the victim.  _See_, _e.g._, _Commonwealth_ v. _Stewart_, 875 N.E.2d 846, 855 (Mass. 2007) (finding that "sufficient evidence for a rational jury to find beyond a reasonable doubt that the defendant was the shooter. . . . supports a finding of

-17-

principal liability"); <u>Commonwealth</u> v. <u>Cannon</u>, 869 N.E.2d 594, 599-600 (Mass. 2007) (noting that there was insufficient evidence to support conviction under a theory of principal liability where "the evidence, collectively, was insufficient for the jury to find beyond a reasonable doubt that the defendant was the shooter").

In contrast, in order to convict on a theory of joint venture, the prosecution must show that "the defendant was at the scene of the crime, with knowledge that another intended to commit the crime and with a shared intent to commit the crime, and that the defendant aided or assisted in the commission of the crime, or was willing and available to assist the other person in carrying out the crime if necessary." <u>Cannon</u>, 869 N.E.2d at 600. Thus, a defendant may be convicted of first degree murder as a joint venturer even if the evidence does not support a finding that he, himself, fired the shots that killed the victim. <u>See</u> <u>id.</u> at 600-02.

The prosecution may choose to try a case under either a theory of principal liability, joint venture, or both. <u>See</u>, <u>e.g.</u>, <u>Stewart</u>, 875 N.E.2d at 854 (noting that the case was submitted to the jury on theories of both principal and joint venture liability). However, if the prosecution chooses to proceed under a theory of principal liability, and the jury does not receive an instruction on joint venture, the joint venture theory is deemed to have been waived and may not be resurrected should the evidence be

-18-

insufficient to convict on a principal liability theory. See Commonwealth v. Salemme, 481 N.E.2d 471, 474 n.5, 476-77 (Mass. 1985) (reversing conviction and remanding for a judgment of acquittal where state waived joint venture theory, but evidence equally well supported conclusion that a co-conspirator shot the victim).

## III.

### A. The Legal Standard Applied by the SJC

Morgan argues that the SJC applied a preponderance of the evidence standard to the evidence presented at his trial, instead of the beyond a reasonable doubt standard required by Jackson. He cites the SJC's statement that Morgan's conviction under a principal liability theory was justified because "the evidence did point more strongly in the direction of the defendant's culpability as the perpetrator such that a jury could reasonably infer that the defendant was the shooter beyond a reasonable doubt." Morgan I, 868 N.E.2d at 107. In particular, Morgan argues that the SJC's statement that the "evidence did point more strongly" to him than to Johnson transformed the beyond a reasonable doubt standard into a mere preponderance of the evidence standard, and that it held that the evidence was sufficient to support his conviction under this lesser standard.

Morgan misreads the SJC's holding. The SJC began its analysis by describing the sufficiency of the evidence standard

-19-

under Massachusetts law.  In doing so, it relied on its previous decision, Commonwealth v. Latimore, 393 N.E.2d 370 (Mass. 1979), in which it laid out a sufficiency of the evidence standard that we have recognized as consistent with Jackson.  See Leftwich v. Maloney, 532 F.3d 20, 24 (1st Cir. 2008) ("[T]he Latimore court adopted the governing federal constitutional standard as the Massachusetts standard for sufficiency of the evidence challenges.").  We have explained that "a state-court adjudication of an issue framed in terms of state law may receive section 2254(d)(1) deference so long as the state standard is at least as protective of the defendant's rights as its federal counterpart." Id. at 23-24; see also O'Laughlin, 568 F.3d at 299 n.15 (stating same and finding the Latimore decision to be an express adoption of the Jackson standard).

The SJC did not depart from this analysis in Morgan's case.  As the district court explained,

> [t]he SJC did not merely determine that there was more evidence suggesting Petitioner, not Johnson (or some third party), pulled the trigger; rather it determined that there was enough evidence pointing to Petitioner "that a jury could reasonably infer that the defendant was the shooter beyond a reasonable doubt." The SJC's use of the "point more strongly" language was a means of distinguishing this case from Commonwealth v. Salemme . . . , in which it had determined that when the available evidence supported an equal likelihood that either of two individuals could have shot the victim, the guilt of neither can be said to have been established by a reasonable doubt.

-20-

Morgan II, 677 F. Supp. 2d at 434-35.[4]  The SJC's "point[s] more

strongly" statement immediately follows an extensive discussion of

Salemme.  Furthermore, the SJC noted that it understood Morgan's

argument to be that the evidence is in equipoise as between the

possibility that he or Johnson murdered Rowe.  Morgan I, 868 N.E.2d

at 106.  Finally, and most importantly, the very sentence in which

the challenged language appears concludes by stating that the

evidence is "such that a jury could reasonably infer that the

defendant was the shooter beyond a reasonable doubt."  Id. at 107

(emphasis added).  Viewed in context, the SJC's statement was

plainly an attempt to distinguish the case before it from Salemme

and was not an articulation of a new standard by which to evaluate

Morgan's sufficiency of the evidence claim.

**B.  The SJC's Application of the Jackson Standard to Morgan's Conviction**

At a hearing before the district court, in his brief on

appeal, and at oral argument Morgan acknowledged that the evidence

presented at trial may have been sufficient for the jury to have

found him guilty on a theory of joint venture.  As recounted above,

there was evidence of Morgan's motive, means and opportunity to

---

[4] The Salemme case is discussed in greater detail below. There, as here, the defendant was one of two suspects in a murder. The SJC reversed his conviction because the evidence as between the two suspects was nearly in equipoise and the only evidence distinguishing the defendant was circumstantial consciousness of guilt evidence.  481 N.E.2d 471.  The SJC held that this evidence was insufficient to establish guilt beyond a reasonable doubt.

commit the murder, as well as evidence that Rowe was last seen alive getting into a car with Morgan and his co-conspirator, that Morgan was aware of his disappearance before Rowe's family realized that he was missing,[5] and that Morgan was aware of the type of weapon used in the killing.

In this appeal, Morgan claims that the evidence offered at his trial equally, or nearly equally, supports the conclusion that Johnson was the shooter and thus principally liable for Rowe's death. In making this argument, Morgan relies on several cases from both federal and Massachusetts state courts holding that "[w]hen the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof." Salemme, 481 N.E.2d at 476 (internal quotation marks omitted).

Morgan relies heavily on Salemme, in which the SJC also addressed a sufficiency of the evidence challenge to a conviction of first degree murder. There, as here, the defendant was one of two people who were last seen with the victim before the murder. In that case, the prosecution's key witness, a waiter, testified

_____

[5] Morgan makes much of somewhat inconsistent testimony by several witnesses as to the time that Lodge saw Rowe getting into Morgan's car, the time that Lodge returned home, and the time that Morgan called Lodge that evening. However, the jury was certainly entitled to believe that a witness's testimony was truthful, even if her recollection of events was off by an hour or two. Furthermore, even accepting Morgan's argument regarding the timing of these events, there was still ample time for Morgan to call Lodge before Rowe's wife first attempted to reach him.

that he saw the two suspects sitting at a table with the victim in a restaurant approximately 10 minutes prior to the shooting. The waiter testified that all three individuals interacted in a friendly manner, and there was no evidence as to what transpired during that 10 minute period. The defendant was tried under a principal liability theory. At trial, the prosecution introduced evidence that the defendant was sitting on the side of the victim from which the shot was fired, as well as evidence of the defendant's flight, which tended to show consciousness of guilt.

After the jury found the defendant guilty, the SJC reversed the conviction and remanded the case for entry of a judgment of acquittal. It held that "[n]o rational trier of fact . . . could conclude, beyond a reasonable doubt . . . that [the defendant], rather than [the alternate suspect], fired the shot." Salemme, 481 N.E.2d at 475 (citation omitted). The SJC noted that the possibility that the victim simply turned his head would explain the direction from which the shot appeared to have been fired, and added that "a defendant may not be convicted solely on the basis of consciousness of guilt evidence." Id. at 476. Essentially, the SJC found that the scant circumstantial evidence pointing to the defendant in that case was insufficient to allow anything more than conjecture as to which suspect actually killed the victim. It went on to explain that "[i]f, upon all the evidence, the question of the guilt of the defendant is left to

conjecture or surmise and has no solid foundation in established facts, a verdict of guilty cannot stand." Id. at 475.

Morgan also relies on the Sixth Circuit's decision in Joseph v. Coyle, 469 F.3d 441 (6th Cir. 2006). In that case, the victim was the current boyfriend of the defendant's ex-girlfriend and the defendant was alleged to have murdered the victim out of jealousy. There was testimony at trial that the defendant wrote letters to his ex-girlfriend communicating his jealousy and indicating that he was secretly watching her and the victim when they were together. Additionally, a car similar to that driven by the defendant and his roommate was seen circling the area prior to the victim's disappearance, and tires on that vehicle were matched to tire tracks found in the area. The defendant admitted that he and his roommate were driving the car on the evening of the murder and a knife that was usually kept in the car was missing the following day. The victim was found with two potentially fatal stab wounds. His body was discovered on property owned by the defendant's grandparents and it was wrapped in construction material, the jagged edge of which matched material found at a job site at which the defendant and his roommate worked.

Considering these facts, the Sixth Circuit found that there was insufficient evidence to support application of a capital specification that required that the defendant was the "principal offender," meaning that he personally struck the fatal blow. It

-24-

reasoned that all of the evidence implicating the defendant also implicated his roommate, and "none of th[e] evidence shows that [the defendant] personally inflicted either stab wound." Joseph, 469 F.3d at 455. The court explained that, for application of the capital specification, "when the defendant and a coconspirator are present at the time and place of the murder, there must be evidence showing that the defendant struck the fatal blow(s)." Id. Importantly, the prosecution conceded at trial that there was uncertainty as to who struck the fatal blow. Id. at 456. As the Sixth Circuit explained:

> [i]n light of the clear line of precedent requiring proof that [the defendant] was the actual killer, the equally clear precedent that the actual-killer element requires proof that the defendant personally inflicted the death blows in a situation where (as here) the defendant and a coconspirator are both present at the scene, and the total absence of such proof (accompanied by the state's concession that it could not offer such proof, to boot), we conclude that the Ohio Supreme Court's decision was an unreasonable application of the due-process standard of Jackson v. Virginia.

Id.

Morgan argues that, as in Salemme and Joseph, the circumstantial evidence offered against him is insufficient to prove beyond a reasonable doubt that he, and not a specific alternate suspect (Johnson), was the principal actor in the crime charged. This argument ignores evidence that goes significantly

-25-

further in distinguishing between Morgan and his co-conspirator than the evidence in Salemme and Joseph.

First, there is evidence of numerous actions and statements by Morgan after Rowe's disappearance that tend to show Morgan's consciousness of guilt. In the evening of the day after Lodge saw Rowe get into a car with Morgan and Johnson, Morgan called Lodge and uncharacteristically kept him on the phone for an extended period of time. In the course of this conversation, Morgan told Lodge that "[Rowe's] wife report[ed] him missing" and "people said I killed him." These statements were made five days before Rowe was actually reported missing, and Rowe's wife testified that, on March 3, the day of Morgan's call to Lodge, she believed that Rowe was not returning her calls or answering the door because he had simply gone to sleep.

Additionally, there was evidence that Morgan went out of his way to ingratiate himself with Lodge. When Lodge was arrested for possession of marijuana, Morgan told him "[y]ou cannot become an informant. You only charged for weed and weed is a misdemeanor. I will get you out. Don't tell them nothing." The day after the arrest, Morgan told Lodge's girlfriend that he would pay Lodge's bail, and, after it was determined that Lodge would not be released because of an immigration detainer, Morgan paid for an attorney to visit Lodge on several occasions to help with his case. Additionally, Morgan paid moving expenses for Lodge's girlfriend.

There is also a series of statements by Morgan to McLean that more directly implicate him in the murder. In particular, McLean testified that he was in possession of a gun that belonged to Rowe, and that shortly after Rowe's disappearance Morgan sought to buy the gun from him because "[Rowe's] friends [were] after him so he wanted a clean gun." When McLean demurred, explaining that Rowe may come back to retrieve the gun, Morgan told him "[w]ell, you don't have to worry about [Rowe], because [you'll] never see [Rowe] again. Trust me, you'll never see [Rowe] again." Not only does this statement indicate that Morgan was aware of Rowe's death, but it also suggests that the gun that Morgan was previously seen with was no longer "clean," meaning that it had since been used in the commission of a crime. Given the fact that McLean testified that he saw both Morgan and Johnson with guns just a few days before, the fact that Morgan is the one who now needs a "clean" gun suggests that he was the shooter.

Additionally, McLean testified that on a later occasion, after Morgan had discovered that Rowe had not burglarized his apartment, Morgan told him that he was "feeling real fucked up . . . because [Rowe] died for the wrong reason." Lastly, McLean testified that, when Morgan told him that Lodge had seen Rowe get into the car with Morgan and Johnson on the evening of his disappearance, he told Morgan "you guys pick up somebody to kill him and somebody there seen, and you guys still do it? You guys

got to be stupid." McLean testified that, in response to this statement, Morgan simply laughed.

The prosecution also introduced numerous statements by Morgan reflecting a general intent to harm the person who robbed his apartment, as well as a specific intent to harm Rowe. In particular, Morgan told Rowe and Rowe's wife that whoever broke into his apartment would "feel it," and, brandishing a gun, told one witness that "you will hear about" the person who robbed him. Furthermore, a second witness testified that on another occasion Morgan, while "waving" a gun, stated that "if [Rowe] or anybody tried to rob him, he would kill them." There was also evidence that Morgan believed Rowe to be a thief, as he told police officers that Rowe "would rob you."[6] Finally, and most significantly, a third witness testified that, two days before Rowe's disappearance, Morgan told him explicitly that he was going to kill Rowe. The witness stated that he unsuccessfully tried to dissuade Morgan from killing Rowe. Morgan replied "if no one see [me] kill [Rowe] there's nothing no one can do about it . . . . As a matter of fact that mother fucker gonna be dead in a week, anyway."

Morgan argues forcefully that the evidence recited above does not rule out the theory that Johnson was the one who actually

_____

[6] Morgan made this statement to police officers approximately two days after Rowe's body was discovered. Morgan was not yet in custody or under arrest, but voluntarily went to the Agawam police station with his lawyer to give a statement to police.

-28-

shot Rowe. He notes that Johnson was present when he made some of the statements and that all of the statements and actions attributed to him would also make sense if Johnson had been the one to kill Rowe: Morgan's intent to kill Rowe would be satisfied; he would have some consciousness of guilt as to the murder; and he would possess information about the killing that a completely innocent person would not.

Morgan's argument is, at best, a reasonable response to the incorrect question. When reviewing a jury verdict for sufficiency of the evidence, we do not ask whether there is a plausible alternate interpretation of the evidence. Rather, the proper question is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.

The jury heard testimony from multiple witnesses regarding Morgan's threats to kill the person who burglarized his apartment, his specific intent to kill Rowe, his need for a "clean" gun after the murder, and his consciousness of guilt after Rowe's disappearance. The jury found this testimony credible, as must we, see Jackson, 443 U.S. at 319 ("Once a defendant has been found guilty of the crime charged . . . upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution"), and, after a proper charge regarding the beyond a

-29-

reasonable doubt standard, determined that Morgan was guilty.  This case does not present "equal or nearly equal circumstantial support for a theory of guilt and a theory of innocence of the crime charged."  O'Laughlin, 568 F.3d at 301.  In fact, there is almost no evidence pointing directly to Johnson, while there is ample evidence, albeit circumstantial, pointing to Morgan.  Of course, Morgan bears no burden to prove his innocence.  However, in evaluating the argument that he makes now, we are obliged to assess any evidence in the record implicating Johnson, and to determine how any such evidence may cast a doubt on Morgan's guilt.  Having done so, we conclude that the evidence in this case is not in equipoise, or close to it, but rather presents sufficient evidence to support Morgan's conviction.

Although "application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion," Jackson, 443 U.S. at 317 n.10, we may not second guess a jury's verdict where it has chosen a reasonable interpretation of the evidence before it, see Guerrero-Guerrero, 776 F.2d at 1075 ("[T]he jury is free to choose among varying interpretations of the

evidence, as long as the interpretation they choose is reasonable.").[7]  That is the case here.[8]

Affirmed.

---

[7] In reaching this conclusion, we note that it is entirely consistent with the guidelines we have previously identified for evaluation of a sufficiency of the evidence challenge to a state court conviction.  Most notably, we consider the totality of the evidence, we do not find that the state court failed to consider a key argument, and we do not find that the state court failed to give appropriate weight to the evidence.  See O'Laughlin, 568 F.3d at 304 n.22.

[8] Of course, because there was no error by the SJC in application of the Jackson standard, there was necessarily no unreasonable application of the standard that would permit the relief sought under AEDPA.

-31-