# United States Court of Appeals
## For the First Circuit

No. 13-1193

YODERNY PENA,

Petitioner, Appellant,

v.

THOMAS DICKHAUT,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Howard, Selya, and Stahl,
Circuit Judges.

David Rossman for appellant.
Amy L. Karangekis, Assistant Attorney General, with whom
Martha Coakley, Attorney General of Massachusetts, was on brief,
for appellee.

November 22, 2013

**STAHL, Circuit Judge**. Petitioner Yoderny Pena was convicted of first-degree murder in Massachusetts state court. After the state court upheld his conviction on appeal, Pena filed a petition for a writ of habeas corpus in federal district court, based on alleged violations of his Fifth and Sixth Amendment rights. The district court denied the petition. For the following reasons, we affirm the district court's decision.

## I. Facts & Background

On March 8, 2004, Pena killed his girlfriend by stabbing her fifty-one times. Five months later, he turned himself in to the police. At trial, Pena acknowledged that he had killed the victim. The defense contended, however, that Pena was mentally impaired at the time of the murder and therefore incapable of forming the mental state required to commit first-degree murder.

The defense's only witness was Dr. Rebecca Brendel, a psychiatrist, who testified to Pena's mental illness based on her review of Pena's medical records and interviews she had with Pena and his sister. Relying on her record review and observations, she "concluded that 'Pena suffered from a chronic and severe mental illness on the day of the killing'" and "expressed 'serious doubt' whether Pena could form the intent required for first-degree murder on the day he killed his girlfriend." Pena v. Dickhaut, No. 09-12204-RWZ, 2013 WL 140262, at *3 (D. Mass. Jan. 11, 2013).

Dr. Brendel's testimony did not convince the jury, which returned a verdict of first-degree murder based on deliberate premeditation and on extreme atrocity or cruelty. The court denied Pena's motion for a new trial, and the Supreme Judicial Court of Massachusetts ("SJC") upheld the conviction on appeal. Thereafter, Pena filed a petition for writ of habeas corpus in federal court.[1]

His original habeas petition raised seven issues, but Pena abandoned all but two of them in the brief he submitted to the district court, in which he argued that the prosecutor improperly commented on his failure to testify in violation of the Fifth Amendment. He also raised a claim of ineffective assistance of counsel on the basis that his attorney inadvertently failed to produce certain medical records to the prosecution during discovery, which prevented her from questioning Dr. Brendel about them at trial. Pena raised, and the SJC rejected, both of these arguments on direct review. The district court held that the SJC's determination of these issues was not unreasonable and denied the petition for habeas relief.

---

[1] It does not appear that Pena pursued any post-conviction relief at the state court level. As the district court observed, however, "Respondent does not contend that any procedural bars prevent reaching the merits of Pena's claims. It appears that the claims were properly exhausted and Pena's petition was timely filed." Pena, 2013 WL 140262, at *2 n.3. Accordingly, we will not address whether the absence of state post-conviction proceedings procedurally bars Pena's federal habeas petition.

-3-

## II.  Analysis

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petitioner must show that the challenged state court adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that the decision "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1)-(2); see also Morgan v. Dickhaut, 677 F.3d 39, 46 (1st Cir. 2012).  In this context, "unreasonable" means "some increment of incorrectness beyond error."  Morgan, 677 F.3d at 46 (internal quotation marks omitted).  This standard is "highly deferential" to the state court.  Burt v. Titlow, 571 U.S. ---, 2013 WL 5904117, at *4 (Nov. 5, 2013) (per curiam).  It requires the petitioner to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement."  Id. (alteration in original) (internal quotation mark omitted).

"A district court's decision to deny or grant a habeas petition under 28 U.S.C. § 2254 is subject to de novo review."  Morgan, 677 F.3d at 46.  Accordingly, like the district court, we must determine whether the state court's decision was unreasonable under the standard set forth in AEDPA.  Stephens v. Hall, 294 F.3d 210, 217 (1st Cir. 2002).

-4-

### A. Fifth Amendment Violation

Pena argues that the state court proceedings violated the Fifth Amendment because the prosecutor improperly commented on Pena's failure to testify. It is well-settled that the Fifth Amendment "forbids . . . comment by the prosecution on the accused's silence." Gomes v. Brady, 564 F.3d 532, 537 (1st Cir. 2009) (alteration in original) (quoting Griffin v. California, 380 U.S. 609, 615 (1965)). To determine whether a petitioner is entitled to collateral relief, "[f]irst, we determine whether the comment offended the Fifth Amendment by insinuating improperly that [the defendant's] failure to testify was evidence of guilt." Id. (citing Griffin, 380 U.S. at 615). "Second, we ascertain whether the comment had a 'substantial and injurious effect or influence in determining the jury's verdict' such that reversal is warranted." Id. (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).

In its closing argument, the prosecution addressed the defense's argument that there was no evidence of motive:

> Two people are close to each other, they have an argument and one of them ends up dead. Well, one of them will never be able to tell us why it happened, will she? Celines Carabello, obviously, can never tell us. The defendant is the only one who knows why he did it. He's the only one who knows why he got so enraged that he had to kill --

At this point, defense counsel objected and the court sustained the objection. The prosecutor continued with his closing

argument, and immediately after he concluded the court issued the following curative instruction to the jury:

> Members of the jury, counsel stated that the defendant is the only one who knows, made reference in that regard. The defendant, as I will instruct you later, has an absolute right not to testify in this case, and it is improper to comment on that right to remain silent. You are to disregard that portion of the prosecutor's closing argument.

During jury instructions, the court again emphasized that Pena had an "absolute right not to testify," and instructed the jury "not to draw any adverse inference against the defendant because he did not testify."

On direct appeal, the SJC found that the impropriety of the prosecutor's remark was a close question, but concluded that "the prosecutor did not intend his comment to be understood as a comment on Pena's failure to testify . . . ." Commonwealth v. Pena, 913 N.E.2d 815, 829 (Mass. 2009). The SJC also found that "the judge's prompt and thorough instructions here were sufficiently clear and complete to negate any possible prejudice to the defendant." Id. at 830 (internal quotation marks omitted).

On habeas review, the district court remarked that the question of the comment's impropriety was indeed close, and "[i]f [it] were deciding the issue in the first instance, [it] might reach a different conclusion." Pena, 2013 WL 140262, at *6. But under the deferential standard of § 2254(d), the district court concluded that the SJC's holding was not "contrary to, or an

unreasonable application of," federal law.  Id.  Moreover, the district court agreed with the SJC that any error was harmless.  Id.  It observed that "[t]he reference to Pena's silence was brief and immediately interrupted by objection; it did not form a major theme of the prosecutor's argument"; and the court's instructions to the jury were prompt and thorough.  Id.  Accordingly, the district court found that "Pena has failed to show that the error had a 'substantial and injurious effect or influence' on the verdict against him."  Id. (quoting Brecht, 507 U.S. at 623).

The district court was correct on both points.  The fact that the district court disagreed with the SJC on the propriety of the remark does not mean the SJC's determination was unreasonable for the purposes of § 2254 review.  In fact, this court has explained that "if it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application of federal law."  Morgan, 677 F.3d at 47 (internal quotation marks omitted).  Under the deferential standard of § 2254(d), the district court correctly allowed the SJC's decision to stand.

Furthermore, we agree with both the SJC and the district court that the error, if any, was harmless.  "This court has repeatedly held that a strong, explicit and thorough curative instruction to disregard improper comments by the prosecutor is sufficient to cure any prejudice from prosecutorial misconduct."

<u>United States</u> v. <u>Rodriquez</u>, 675 F.3d 48, 63 (1st Cir. 2012) (citing <u>United States</u> v. <u>Riccio</u>, 529 F.3d 40, 45 (1st Cir. 2008)). The court's instructions here were more than sufficient. Indeed, we have found that even without a contemporaneous curative instruction, standard jury instructions alone can be sufficient to mitigate the prejudice of an improper comment if the comment was an "isolated instance of misconduct" and the evidence against the defendant was "compelling." <u>Gomes</u>, 564 F.3d at 538-9. Here, as the district court pointed out, the challenged comment was brief and quickly interrupted, and the prosecution's case rested on the substantial evidence it presented at trial, not on an impermissible inference drawn from Pena's silence. Given the strength of the court's curative instructions, we find the alleged error to be harmless under these circumstances. We therefore affirm the district court's holding regarding the Fifth Amendment claim.

## B. Sixth Amendment Violation

Pena claims that his attorney's ineffective assistance at trial deprived him of his Sixth Amendment right to counsel. To succeed on this claim, Pena "must demonstrate both: (1) that 'counsel's performance was deficient,' meaning that 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment'; and (2) 'that the deficient performance prejudiced the defense.'" <u>United States</u> v.

<u>Valerio</u>, 676 F.3d 237, 246 (1st Cir. 2012) (quoting <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668, 687 (1984)).

To demonstrate "deficient performance," Pena "must show that his trial counsel's representation fell below an objective standard of reasonableness." <u>Rodriguez</u>, 675 F.3d at 56 (internal quotation marks omitted). This "highly deferential" standard requires Pena to "overcome the presumption that . . . the challenged action might be considered sound trial strategy." <u>Id.</u> (alteration in original) (internal citations and quotation marks omitted). A lawyer's performance is constitutionally deficient "only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it." <u>Id.</u> (internal quotation marks omitted).

"To demonstrate 'prejudice,' [Pena] must show 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" <u>Id.</u> at 57 (quoting <u>Porter</u> v. <u>McCollum</u>, 558 U.S. 30, 38–39 (2009)). "Consequently, we must consider, on whole-record review, whether the trial might have ended differently absent the lawyer's blunder." <u>Ouber</u> v. <u>Guarino</u>, 293 F.3d 19, 33 (1st Cir. 2002).

The Supreme Court recently explained that when a federal court reviews an ineffective assistance of counsel claim under § 2254, it must use a "doubly deferential standard of review that gives both the state court and the defense attorney the benefit of

the doubt." <u>Burt</u>, 2013 WL 5904117, at *2 (internal quotation marks omitted); <u>see also</u> <u>Morgan</u>, 677 F.3d at 47 ("[H]abeas review involves the layering of two standards. The habeas question of whether the state court decision is objectively unreasonable is layered on top of the underlying standard governing the constitutional right asserted.") (internal quotation marks omitted). This is an extremely difficult standard to meet, and Pena has failed to do so here.

### 1. The Testimony of Dr. Brendel and the Holy Family Hospital Records

Pena's Sixth Amendment claim is based on his counsel's failure to enter into evidence records of Pena's hospitalization at Holy Family Hospital ("HFH") in August 2004. Although Dr. Brendel reviewed these records in preparation for her testimony, Pena's counsel inadvertently failed to produce them to the prosecution during discovery. Therefore, the prosecutor successfully objected to Dr. Brendel's testimony regarding the HFH records and the court struck that portion of her testimony from the record.

Dr. Brendel's testimony was based on Pena's medical records going back to 1996, as well as interviews she conducted with Pena and his sister. Dr. Brendel testified that, beginning in 1996 in the Dominican Republic, Pena was diagnosed with bipolar disorder with psychotic features and treated for symptoms of severe depression and psychosis. He also had problems with drug and alcohol abuse at that time. In 1999, he was committed to a

-10-

hospital and given electroconvulsive therapy and antipsychotic medications.

Pena moved to the United States in 2002, where he continued to experience problems with mental health and substance abuse. In 2003, a doctor at Boston Medical Center diagnosed him with recurrent major depression and prescribed several medications. He saw a social worker five days before the murder, who noted depressive symptoms and poor memory and concentration.

After the murder, but shortly before Pena turned himself in, he went to a police station complaining that voices in his head were telling him to hurt himself. He was referred to HFH, where he was hospitalized for seven days. The records from that hospitalization include a diagnosis of "psychotic disorder, not otherwise specified," and confirm that Pena went to a police station seeking help for auditory hallucinations. The records note that Pena "does not appear to be a reliable historian," and explain that "it is difficult to determine whether his responses are due to cognitive impairment or planned evasiveness and avoidance, or one posing as a mental patient." They further state that "[t]here is a suspicion of being purposely avoidant and vague on account of his illegal [immigration] status."

Once Pena was in custody for the murder, he was evaluated at Bridgewater State Hospital for competence to stand trial. The report from Bridgewater indicated a "high suspicion that Pena was

feigning memory problems."  In their interviews with Dr. Brendel prior to trial, both Pena and his sister reported that he had been experiencing symptoms of mental illness in the period leading up to the murder.  Pena also told Dr. Brendel that he had not slept for three nights prior to the murder and had been using cocaine, marijuana, and alcohol.

During the course of Dr. Brendel's testimony, Pena's counsel asked about the HFH records.  Dr. Brendel responded that:

> [I]n those records, there was some concern about Mr. Pena's difficulty with memory and being able to give an accurate history.  The discharge diagnosis included a diagnosis of psychosis not otherwise specified.  So, the physicians in the hospital did observe him at some time during the hospitalization to be suffering from psychotic symptoms.

At that point, the prosecutor objected on the grounds that Pena had not produced the HFH records in discovery.  He did not appear opposed to the admission of the records into evidence, but he stated, "I'd like to see them, at the very least.  If not, I ask that the answer be stricken."  Pena's counsel responded that "if they weren't provided, it was inadvertently that they weren't provided.  And I don't have any more questions about these records."  The court decided to strike Dr. Brendel's answer regarding the HFH records, and Pena's counsel offered no argument against the court's decision.

## 2.   Application of <u>Strickland</u> to the Omission of the HFH Records

On direct appeal, the SJC rejected Pena's argument that his counsel's failure to produce the HFH records and introduce them into evidence constituted ineffective assistance of counsel. It decided that "even had the Holy Family Hospital records been offered and admitted in evidence, they merely would have been cumulative of other testimony offered by Dr. Brendel, a highly qualified psychiatrist." <u>Pena</u>, 913 N.E.2d at 831. It also held that "counsel's failure to offer the records in evidence (or to make an offer of proof with them when a single answer of Dr. Brendel's was struck) was plainly a strategic decision that was not manifestly unreasonable," particularly in view of the fact that the records contained information that was potentially harmful to Pena. <u>Id.</u> at 832. On habeas review, the district court held that the SJC's resolution of this claim was reasonable. <u>Pena</u>, 2013 WL 140262, at *4-5.

Pena argues on appeal that the SJC's determination of the Sixth Amendment claim was unreasonable, because of the importance of the HFH records to Pena's defense. In Pena's view, "the way this case was presented to the jury revolved around whether Dr. Brendel had an adequate basis for the opinions she gave concerning Mr. Pena's mental state at the time of the murder." The prosecutor attacked Dr. Brendel's credibility on the grounds that "all of the facts about Mr. Pena's mental illness on which she relied came from

-13-

the mouth of Mr. Pena himself, [and] were therefore self serving . . . ." But, according to Pena, the HFH records were unique in this respect, because there was no other documentation that Pena went to a police station complaining of voices in his head. The HFH records therefore offered the "only evidence that would have directly countered the attack that the prosecutor made on her credibility." The fact that he went to a police station to report voices in his head demonstrates objectively and conclusively, Pena argues, that he was mentally ill at the time of the murder, because "[n]o one who is a fugitive in a murder case is going to go to a police station and ask for help from mysterious voices unless the voices are actually drumming their destructive message into the target's brain."

Therefore, according to Pena, the HFH records were not cumulative, because they offered uniquely objective evidence of Pena's mental illness. For the same reason, the failure of Pena's trial counsel to introduce them into the record had to be prejudicial — "[i]t was the only evidence that provided external verification for the information on which Dr. Brendel relied." Pena argues further that no competent attorney would make the strategic decision to omit such persuasive evidence from the record, and that in fact Pena's attorney never made that choice. Instead, as Pena reads the record, his attorney fully intended to elicit testimony about the records, regardless of the potentially

damaging information in them about Pena's memory problems and possible evasiveness. She declined to go forward with her questioning only when her inadvertent failure to produce came to light, not because of any reasoned assessment of the evidence.

For two reasons, we do not believe that the HFH records were as conclusive as Pena portrays them. First, Pena turned himself in for the murder shortly after his hospitalization at HFH,[2] and his medical history includes multiple references to possible deception on his part — either feigning memory loss or giving evasive answers. A jury could conclude, therefore, that Pena was falsely reporting the voices in his head to provide a defense for the murder he had committed. Pena dismisses this possibility as far-fetched, because a rational fugitive would never risk walking into a police station just to feign illness. But the fact that Pena turned himself in for the murder a short time later makes it questionable that he feared apprehension by the police at that time. Indeed, he may have been planning it.

A second problem is that there is a five-month gap between the murder and the HFH hospitalization. Even if the HFH records were conclusive proof of mental illness at that time, they would not prove that he was suffering any symptoms at the time of the murder. Dr. Brendel specifically testified that Pena's

---

[2] Pena was hospitalized at HFH August 3-10, 2004. He surrendered to the police on August 27. Pena, 913 N.E.2d at 822.

-15-

symptoms of mental illness "wax and wane"; therefore, she explained, Pena could have been experiencing serious symptoms at the time of the murder, but not when he was evaluated at Bridgewater. The same reasoning applies equally, however, in the other direction: he could have been experiencing symptoms while at HFH, but not at the time of the murder.

For these reasons, we do not share Pena's view that the HFH records have unique and convincing evidentiary value. Therefore, we conclude that the SJC was reasonable in determining that their omission was not prejudicial. Furthermore, whether or not Pena's trial counsel made a strategic choice to omit the evidence,[3] we do no think this is an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Valerio, 676 F.3d at 246. The failure to introduce a single piece of evidence of questionable value may indeed seem like a mistake in hindsight, but it is not an error of constitutional magnitude.

## III. Conclusion

For the foregoing reasons, we affirm the district court's order denying habeas relief.

---

[3] We do not imply that the subjective intentions of Pena's trial counsel are determinative; the reasonableness test under Strickland is objective. See Rodriguez, 675 F.3d at 56.

-16-