# United States Court of Appeals
## For the First Circuit

No. 13-1483

DAVID G. MAGRAW,

Petitioner, Appellant,

v.

GARY RODEN, SUPERINTENDENT,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,[*] Associate Justice,
and Selya, Circuit Judge.

Jeffrey M. Brandt, with whom Robinson & Brandt, P.S.C. was on brief, for appellant.
Anne M. Thomas, Assistant Attorney General, Criminal Bureau, with whom Martha Coakley, Attorney General, was on brief, for appellee.

February 14, 2014

---

[*]Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SELYA, Circuit Judge.** This is a habeas proceeding brought by a state prisoner against a Massachusetts correctional official in an effort to secure relief from a conviction and life sentence for second-degree murder. In pursuit of that habeas relief, he advances three discrete claims of constitutional error. After thoughtful consideration, the district court rejected these claims. So do we.

## I. BACKGROUND

Because the petitioner's asseverational array includes a challenge to the sufficiency of the evidence, we rehearse the background facts in the light most flattering to the jury's verdict. See Foxworth v. St. Amand, 570 F.3d 414, 420 (1st Cir. 2009). In the summer of 1990, David and Nancy Magraw were in the throes of a nasty divorce. The warring spouses and their attorneys arranged to meet at 2:00 p.m. on July 23, but Nancy Magraw never arrived. After unsuccessfully attempting to ascertain her whereabouts, the attorneys and her husband (the petitioner here) were advised of her death. They immediately went to her home in Walpole, Massachusetts and found her badly bruised body on the living room floor. The police were already at the scene.

An autopsy determined the cause of death to be mechanical asphyxiation due to compression of the neck (and perhaps the mouth and nose). Following further investigation, a state grand jury indicted the petitioner for the slaying. The petitioner's initial

-2-

trial resulted in his conviction for first-degree murder, but that conviction was set aside on appeal.  See Commonwealth v. Magraw, 690 N.E.2d 400, 401 (Mass. 1998).

At his second trial, the petitioner argued, inter alia, that the victim had died from natural causes and that, in all events, he was not her killer.  The jury rejected these contentions and found the petitioner guilty of second-degree murder.

The petitioner appealed unsuccessfully to the Massachusetts Appeals Court (MAC).  See Commonwealth v. Magraw (Magraw II), No. 99-P-1937, 2003 WL 21955875, at *1 (Mass. App. Ct. Aug. 15, 2003).  The Massachusetts Supreme Judicial Court denied his application for leave to seek further appellate review.  See Commonwealth v. Magraw, 799 N.E.2d 593 (Mass. 2003) (table).  The petitioner then repaired to the federal district court, seeking a writ of habeas corpus.  See 28 U.S.C. § 2254.  The district court proved inhospitable to the petitioner's importunings, see Magraw v. Roden (Magraw III), No. 09-11534, 2013 WL 1213056, at *6 (D. Mass. Mar. 22, 2013), but issued a certificate of appealability as to three claims, see 28 U.S.C. § 2253(c).

After limning the framework for habeas relief, we consider the petitioner's claims of error sequentially.

## II.  THE HABEAS FRAMEWORK

When (as in this case) the district court has not undertaken independent factfinding, its decision to grant or deny habeas relief engenders de novo review.  See Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007).  The beacon by which a federal habeas court must steer is the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1218-1219, codified at 28 U.S.C. § 2254.  Where, as here, the state court has adjudicated a petitioner's federal claims on the merits, the federal court may issue the writ if the state-court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Under the AEDPA's unreasonable application standard, a "state court's decision is not vulnerable unless it evinces some increment of incorrectness beyond mere error."  Leftwich v. Maloney, 532 F.3d 20, 23 (1st Cir. 2008); accord McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002) (en banc).

## III.  SUFFICIENCY OF THE EVIDENCE

The petitioner's first claim of error posits that the evidence adduced at his trial was insufficient to support his conviction for second-degree murder.  In his view, the evidence failed to establish either that the victim was murdered or that, if a murder occurred, he was the perpetrator.

-4-

The constitutional standard for evidentiary sufficiency is familiar. Under clearly established Supreme Court precedent, a conviction must be sustained if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Although this standard exhibits great respect for the jury's verdict, an inquiring court must nonetheless avoid "evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995). For present purposes, the question reduces to whether the MAC unreasonably applied the Jackson standard in determining that the evidence was sufficient to allow a rational jury to conclude both that the victim was murdered and that the petitioner was her killer.

### A. Cause of Death.

We need not linger long over the sufficiency of the evidence anent the cause of death. The Commonwealth introduced considerable evidence that the victim was strangled. This evidence included the testimony of two medical examiners, one of whom was the physician who had performed the autopsy.

The autopsy findings bolstered this opinion testimony. The autopsy showed petechial hemorrhages on the victim's face, lungs, heart, and inner eyelids. The physician who performed the

autopsy explained that these findings were consistent with rupture upon asphyxiation. Similarly, the autopsy revealed hemorrhage around the thyroid cartilage and other tissues in the victim's neck. Her inner lips were cut, and her tongue had bite marks. The medical witnesses attested that this pattern of injuries was consistent with strangulation.

This is not to say that the cause-of-death evidence was completely one-sided. The petitioner proffered a medical expert who opined that the victim died of natural causes. This witness expressed skepticism about the Commonwealth's theory because the victim's corpse lacked some common indicia of manual strangulation, such as bruising in certain neck tissues, suspicious marks on the outside of the neck, and fractured hyoid and cricoid bones. This witness also tried to explain away the petechiae and larynx hemorrhages. The capstone of this testimony was the witness's determination that the victim had suffered from chronic and acute inflammation of the heart, which he concluded was the probable cause of her death.

Citing this conflicting evidence, the petitioner reminds us that when "the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction." O'Laughlin v. O'Brien, 568 F.3d 287, 301 (1st Cir. 2009) (quoting United States v. Flores-

Rivera, 56 F.3d 319, 323 (1st Cir. 1995)).  He argues that the evidence as to cause of death in this case is in equipoise and, thus, that the MAC unreasonably applied the Jackson standard in allowing the conviction to stand.

This argument is wide of the mark.  It fails to recognize that this equal-evidence rule takes hold only after we have drawn all reasonable inferences in favor of the verdict.  See, e.g., Morgan v. Dickhaut, 677 F.3d 39, 53-54 (1st Cir.), cert. denied, 133 S. Ct. 449 (2012).  In this case, the jury had to choose between the conflicting views of each side's expert witnesses, and its verdict indicates that it chose to believe the Commonwealth's experts.  Once that choice is factored into the equation, the evidence cannot fairly be said to be in equipoise.

Nor can we second-guess the MAC's decision to accept the jury's choice.  See Magraw II, 2003 WL 21955875, at *2.  Resolving conflicts in the evidence is customary fare for jurors and there is nothing unreasonable about what the jurors did here.  This is particularly true because the record makes manifest that the Commonwealth's experts responded directly to the petitioner's theory.  One acknowledged that the victim's heart showed signs of inflammation, but explained that such inflammation is not typically fatal.  The other stated flatly that the victim's pre-existing cardiac condition "had nothing to do with the cause of death."

-7-

That ends this aspect of the matter. Viewing the evidence in the light most favorable to the verdict, it is readily evident that the jury chose to credit the Commonwealth's amply supported cause-of-death hypothesis. Because that choice was well within the jury's province, the MAC reasonably applied the Jackson standard in deeming the evidence sufficient to support a finding that the victim met her death through strangulation. See Cavazos v. Smith, 132 S. Ct. 2, 6-7 (2011) (per curiam) (summarily reversing grant of habeas relief and upholding jury's choice between competing cause-of-death theories).

## B. **Identity of the Perpetrator.**

The petitioner likewise brands the evidence insufficient to show that he killed his wife. In support, he notes that the case against him was entirely circumstantial; that no hard evidence linked him to his wife's demise; and that the prosecution put the time of death at sometime between 11:19 a.m. and 1:19 p.m., whereas the evidence indicated that he had left his wife's home no later than 10:15 a.m. that day.[1]

---

[1] The petitioner incorporates in this argument an assertion that testimony from his wife's attorney about statements that the petitioner allegedly made, introduced to show consciousness of guilt, was so evidently false that it should be disregarded. We need not explore this assertion: the record, even if stripped of the challenged testimony, contains sufficient evidence to sustain a finding that the petitioner committed the murder.

With this view of the record in mind, the petitioner invokes our decision in O'Laughlin. There, we granted habeas relief after deeming circumstantial evidence insufficient to support the conviction. See 568 F.3d at 308.

The principal problem with this argument is that, under Jackson, direct evidence is not necessary to sustain a conviction. See, e.g., United States v. O'Brien, 14 F.3d 703, 706-07 (1st Cir. 1994). This principle is even more firmly established in connection with the deferential approach to state-court decisionmaking that federal habeas review demands. See, e.g., Morgan, 677 F.3d at 54; Leftwich, 532 F.3d at 27-28; Hurtado v. Tucker, 245 F.3d 7, 18-19 (1st Cir. 2001).

What is more, not all circumstantial evidence cases are created equal. The evidence in this case, though circumstantial, is far stronger than the evidence in O'Laughlin, especially with respect to motive and opportunity.

To begin, the petitioner has never questioned that he possessed the physical ability to strangle his wife. He also had a powerful motive: the couple was embroiled in an acrimonious divorce with hundreds of thousands of dollars on the line. No items were missing from the victim's house (a fact that tended to exclude robbery as a possible motive). In addition, the petitioner had recently left a rifle on the victim's bed — an act easily construed as threatening.

Furthermore, the petitioner had access to the victim's home and there were no signs of forced entry.[2]  The jury could plausibly have concluded that the petitioner was the last person to have seen the victim alive.  Witnesses testified that, by his own account, he was with her in her home from roughly 9:00 a.m. to 10:15 a.m. on the morning of the murder.  Although this does not line up perfectly with the time of death estimated by the medical examiner, estimates are merely estimates; and the jury had room to conclude either that the slaying occurred earlier or that the petitioner left later than he claimed.[3]  Here, moreover, a jury reasonably could have rejected both the petitioner's claim that his wife had been unharmed when he left her home and his related claim that she had died from natural causes.  This is significant because "if the jury disbelieves a defendant's story, it may legitimately presume that the fabrication was an indicium of his guilt." Leftwich, 532 F.3d at 26.  Virtually by definition, any circumstantial evidence case requires some level of conjecture. "But a conjecture consistent with the evidence becomes less and less a conjecture, and moves gradually toward proof, as alternative

_____

[2]  Unlike O'Laughlin, in which "several others on the maintenance staff possessed a master key" in addition to the petitioner, 568 F.3d at 302, here, there is no indication that access to the victim's home was widely shared.

[3] To be sure, the petitioner proffered an alibi witness, but the witness (a tenant at one of the petitioner's properties) could not remember the exact time that the petitioner arrived at the tenant's apartment.

-10-

innocent explanations are discarded or made less likely." Stewart v. Coalter, 48 F.3d 610, 615-16 (1st Cir. 1995). So it is here.

The short of it is that the Commonwealth presented evidence adequate to show that the victim was murdered; that the petitioner had both the means and the motive to commit the murder; that he had threatened the victim in the past; that he had been with the victim in close proximity to the time of her death; and that his explanation of the events was open to question. In conducting its review of a state-court conviction for evidentiary sufficiency, a habeas court may not freely reweigh competing inferences but must accept those reasonable inferences that are most compatible with the jury's verdict. See, e.g., Tash v. Roden, 626 F.3d 15, 20 (1st Cir. 2010). Adhering to this principle, we conclude that the MAC did not unreasonably apply the Jackson standard in rejecting the petitioner's claim of evidentiary insufficiency.

## IV. SPOLIATION

At some time after the autopsy, the Commonwealth discarded the victim's larynx. The petitioner now claims that the loss of this potential source of evidence violated his due process rights. The MAC rejected this claim. See Magraw II, 2003 WL 21955875, at *1-2. So did the district court. See Magraw III, 2013 WL 1213056, at *4-5.

The record indicates that the larynx was examined both at the autopsy and at a subsequent meeting involving three state medical examiners. However, the Commonwealth failed to preserve the larynx, and it was not to be found when (in 1994) the defense team asked to examine it in preparation for the petitioner's first trial.

It is common ground that, upon request, a criminal defendant has a due process right to review all evidence in the government's possession that is material to his guilt or punishment. See Brady v. Maryland, 373 U.S. 83, 87 (1963). But this right would be empty if the government could trump it by the simple expedient of destroying evidence harmful to its theory of the case. A pair of Supreme Court decisions speak to the dimensions of a defendant's rights when requested evidence, formerly in the government's possession, is lost, destroyed, or otherwise unavailable.

The first of these bookend decisions is California v. Trombetta, 467 U.S. 479 (1984). Under Trombetta, a state violates due process when it fails to preserve irreplaceable evidence possessing exculpatory value that is apparent before its destruction. See id. 488-89. This precept holds true regardless of why the evidence was destroyed. See id.; United States v. Laurent, 607 F.3d 895, 900 (1st Cir. 2010).

-12-

The other bookend decision is <u>Arizona</u> v. <u>Youngblood</u>, 488 U.S. 51 (1988). Under <u>Youngblood</u>, a different rule obtains when the evidence is merely potentially useful to the defense (that is, when its exculpatory value was not apparent before its destruction). <u>See</u> <u>id.</u> at 57-58. In that event, the defendant cannot prevail on his due process claim unless he establishes that the state acted in bad faith. <u>See</u> <u>id.</u>

Fairly read, <u>Trombetta</u> and <u>Youngblood</u> frame a dichotomy between evidence that is apparently exculpatory and evidence that is no more than potentially useful. <u>See</u> <u>Illinois</u> v. <u>Fisher</u>, 540 U.S. 544, 547-48 (2004) (per curiam); <u>Olszewski</u> v. <u>Spencer</u>, 466 F.3d 47, 56-57 (1st Cir. 2006). Because the record contains nothing to suggest that the Commonwealth acted in bad faith, the petitioner's claim of error necessarily turns on which branch of the dichotomy applies here.

We conclude that <u>Youngblood</u> is controlling. There, the Court considered the import of spoiled semen samples in a rape case in which the rapist's identity had been the primary issue at trial. <u>See</u> 488 U.S. at 53-54. The defendant argued that these samples, if properly preserved or tested earlier, might well have served to exonerate him. <u>See</u> <u>id.</u> at 54. But the Court was chary of imposing upon police an "absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." <u>Id.</u> at 58. Since the semen samples

-13-

were no more than "potentially exculpatory evidence" and there was no evidence that the authorities had acted in bad faith, the Court ruled that the defendant's due process rights had not been infringed. Id. at 57-58 (quoting Trombetta, 467 U.S. at 486).

The parallel between Youngblood and the case at hand is striking. The petitioner does not point to any frankly exculpatory aspect of the larynx but, rather, argues merely that if his expert had the opportunity to inspect the larynx, he might well have found evidence that the victim was not strangled. So viewed, the larynx — like the semen samples in Youngblood — is evidence about which "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Id. at 57.

Despite the obvious similarity between this case and Youngblood, the petitioner strives to convince us that logic militates toward a conclusion that the larynx was exculpatory. In support, he notes that the Commonwealth's experts inspected the larynx at some length and speculates that the Commonwealth surely would have introduced the larynx into evidence if that examination tended to establish that the victim was strangled. Building on this speculation, he insists that if the larynx was not inculpatory, then it must have been exculpatory.

We do not agree. Giving force to this line of reasoning would topple the careful balance constructed by the Supreme Court's

-14-

decisions in Trombetta and Youngblood.  It will often be the case that evidence no longer available might have been inculpatory, exculpatory, or simply inconclusive.  If the state's failure to preserve such evidence could give rise to an inference that the evidence was exculpatory, there would be little need for the Trombetta-Youngblood dichotomy.

We add that, if the inference suggested by the petitioner were to prevail, the state would have little choice but to preserve all evidence that might conceivably be useful to the defense.  Such a result would run directly contrary to the goal of the Youngblood Court.  See 488 U.S. at 58.

If more were needed — and we doubt that it is — the petitioner's thesis that the larynx was most likely exculpatory is not supported by the factual record.  A plethora of evidence gleaned from the larynx was in fact tendered to the petitioner and introduced into evidence at the trial.  This evidence fit neatly with the Commonwealth's strangulation theory.  For example, the medical examiner who performed the autopsy and found strangulation to be the cause of death testified at length to findings stemming from a layer-by-layer dissection of the victim's neck, including identification of hemorrhages throughout the entire larynx structure.  Similarly, a second medical examiner opined that injuries around the victim's neck and larynx were indicative of strangulation.  She based this conclusion in part on photographs of

-15-

the neck and larynx, which were available to the defense and explained to the jury. This evidentiary predicate undermines the petitioner's ipse dixit that the preservation of the larynx would likely have served to exonerate him. On this record, then, it would be folly to say that the MAC unreasonably applied Trombetta and Youngblood when it declined to find a due process violation based on the unavailability of the larynx itself.[4] Cf. Youngblood, 488 U.S. at 58 (observing that courts ordinarily should abjure "'the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed'" (quoting Trombetta, 467 U.S. at 486)).

## V.  PROSECUTORIAL MISCONDUCT

As a parting shot, the petitioner asserts that certain statements made by the prosecutor were so outlandish as to sully the fairness of the trial. These statements fall into two groups. First, the petitioner identifies three instances in which the prosecutor, while cross-examining the petitioner's medical expert, made reference to the petitioner's prior trial. Second, he identifies two instances in which the prosecutor referred to the

---

[4] Because the larynx evidence was not apparently exculpatory, we need not address the ancillary question of whether that unavailable evidence was irreplaceable. See Olszewski, 466 F.3d at 58 (describing irreplaceability requirement). We do note, however, that the MAC concluded that "the absence of such evidence did not preclude the defendant from presenting his theory of the case to the jury," Magraw II, 2003 WL 21955875, at *2, and that this conclusion bears the hallmarks of objective reasonableness.

petitioner's placement of a rifle on his wife's bed.  As to both groups, the petitioner avers that the prosecutor's references were directly contrary to instructions previously given by the trial justice.

In habeas jurisdiction, our focus is "the narrow one of due process, and not the broad exercise of supervisory power." Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974) (internal quotation mark omitted).  The clearly established law in this area is exemplified by the Supreme Court's decision in Darden v. Wainwright, 477 U.S. 168 (1986).  Under Darden, the constitutional test is whether the prosecutor's alleged misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Id. at 181 (quoting Donnelly, 416 U.S. at 643).  This is a case-specific inquiry; "[t]here is no precise federal standard governing due process claims based on a prosecutor's remarks." Dagley v. Russo, 540 F.3d 8, 15 n.3 (1st Cir. 2008).

The MAC disposed of this issue in a footnote: "The defendant's remaining claims regarding prosecutorial misconduct lack merit for the reasons stated at pages 49-67 of the Commonwealth's brief, and they do not warrant further discussion by us." Magraw II, 2003 WL 21955875, at *1 n.1.  The petitioner succeeded in persuading the district court that the cursory nature of this ruling paved the way for de novo review.  See Magraw III,

-17-

2013 WL 1213056, at *5; see also Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001) (calling for de novo review of claims not addressed on merits by state court).

We do not think that de novo review is appropriate. Federal habeas courts must apply a rebuttable presumption that any federal claim properly brought before the state court and thereafter rejected was "adjudicated on the merits" for AEDPA purposes. See Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013). This is so even if the state-court opinion does not expressly address the issue. See id. Such an approach strikes a careful federalist balance and recognizes that a federal habeas court has "no power to tell state courts how they must write their opinions." Coleman v. Thompson, 501 U.S. 722, 739 (1991); see Hodge v. Mendonsa, 739 F.3d 34, 45 (1st Cir. 2013) (recognizing that "state appellate courts carrying heavy caseloads have adopted many mechanisms to handle their case load expeditiously").

In this case, the MAC made pellucid that the prosecutorial misconduct claim had its full attention. Although the MAC's rejection was not elaborately reasoned, the pages of the Commonwealth's brief to which it alluded described in some detail both the instances of alleged misconduct and the reasons why the behavior was innocuous. The brief's analysis closely mirrors what one would expect of a court addressing the federal issues raised. It follows that, for habeas purposes, this claim must be deemed to

have been adjudicated on the merits by the MAC.  See, e.g., Hodge, 739 F.3d 34, 41-42; Zuluaga v. Spencer, 585 F.3d 27, 31 (1st Cir. 2009).  Our review therefore centers on whether the MAC's resolution of the claim constituted an unreasonable application of Darden.

We start with the trial justice's pre-trial instruction to the parties to eschew any reference to the earlier murder trial. The lawyers were told in substance that, when questioning witnesses about prior testimony, they should use blander terms like "proceeding."[5]  Despite this instruction, the prosecutor thrice referred to the first "trial" while attempting to impeach the petitioner's medical expert.  These references were isolated and dispersed through a lengthy cross-examination.  The trial justice did not believe that they required a mistrial, nor did the MAC believe that they rendered the trial unfair.

The jury obviously knew that some sort of prior proceeding took place; the trial transcript contains ubiquitous allusions to a prior hearing, to prior testimony, and the like — and many of these allusions were made by defense counsel.  Given this context, it seems highly unlikely that three uses of the word

---

[5] The record does not contain the trial justice's verbatim instruction, but the parties seem to be in agreement as to its substance.  This informal interpretation of what the trial justice said is consistent with the multitude of references in the trial transcript, not objected to, to a prior hearing and prior testimony.

-19-

"trial," in a thirteen-day proceeding unadorned by any mention of the prior trial's nature or outcome, would have altered the jury's perceptions of the merits of the petitioner's case. Consequently, we discern no error — let alone the increment of incorrectness that habeas relief requires — in the MAC's refusal to vacate the petitioner's conviction based on these remarks.[6] See Donnelly, 416 U.S. at 647 (stating that "a court should not lightly infer . . . that a jury, sitting through lengthy exhortation," will draw the most damaging meaning from a prosecutor's remark); United States v. Lilly, 983 F.2d 300, 307 (1st Cir. 1992) (similar).

This leaves the second group of statements, which took place during the prosecutor's cross-examination of the petitioner's son. Some background is necessary.

During earlier proceedings, the son had invoked his Fifth Amendment right against self-incrimination when questioned about two rifles that belonged to his father. One of these rifles had once been left by the petitioner on the victim's bed. The son apparently was concerned that some of his conduct, possibly in moving or hiding the rifles, might expose him to criminal prosecution. Following an in camera hearing, the trial justice instructed the prosecutor that he was not to ask any rifle-related

---

[6] We note that the trial justice twice offered to give a curative instruction to the jury. The petitioner's counsel demurred.

-20-

questions that might implicate the son's privilege against self-incrimination.

The prosecutor did not violate this proscription. His two rifle-related questions to the son drew no objection. They inquired only as to whether the son knew whether the "rifle on the bed" incident had occurred. The witness answered the questions without invoking the Fifth Amendment.

Reading the record as a whole, it is surpassingly difficult to see how the posing of these rifle-related questions constituted misconduct at all. Manifestly, then, the MAC's determination that these references did not constitute prosecutorial misconduct sufficient to warrant setting aside the petitioner's conviction was not an unreasonable application of clearly established law.

## VI. CONCLUSION

We need go no further. For the reasons elucidated above, the judgment of the district court is

**Affirmed.**