# United States Court of Appeals
## For the First Circuit

No. 13-1642

CORINTHIAN C. HOUSEN, JR.,

Petitioner, Appellant,

v.

BRUCE GELB, SUPERINTENDENT,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,[*] Associate Justice,
and Selya, Circuit Judge.

Stewart T. Graham, Jr., with whom Graham & Graham was on brief, for appellant.
Todd M. Blume, Assistant Attorney General, Criminal Bureau, with whom Martha Coakley, Attorney General, was on brief, for appellee.

February 24, 2014

---

[*]Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SELYA, Circuit Judge.** This habeas appeal, brought by a state prisoner against a Massachusetts correctional official for relief from a conviction and life sentence for first-degree murder, is governed by the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254. In pertinent part, the AEDPA instructs that a writ of habeas corpus may issue upon a showing that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Id. § 2254(d)(1). This provision lies at the epicenter of the petitioner's appeal.

The petitioner's first claim of error involves what is unarguably a clearly established constitutional rule: when evaluating a claim of evidentiary insufficiency, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The petitioner asserts that, in his case, the state court recognized this rule but applied it unreasonably.

The second claim of error involves an allegation of prosecutorial inconsistency. At the petitioner's state-court trial, the Commonwealth argued that he had shot and killed the victim. At an earlier state-court trial, however, the Commonwealth

argued that the defendant in that case (the petitioner's accomplice) had shot and killed the victim. The petitioner asserts that, under clearly established law, these inconsistent approaches rendered his trial fundamentally unfair and deprived him of his constitutional right to due process.

After careful consideration of this asseverational array against the backdrop of an amplitudinous record, we affirm the district court's denial of habeas relief.

## I. BACKGROUND

We touch lightly upon the factual findings of the state court, supplementing those findings when necessary with consistent record evidence. See Tash v. Roden, 626 F.3d 15, 16 (1st Cir. 2010). The reader who hungers for more exegetic detail should consult the underlying opinion of the Massachusetts Supreme Judicial Court (SJC). See Commonwealth v. Housen (Housen I), 940 N.E.2d 437, 440-42 (Mass. 2011). "Because this appeal involves a challenge to evidentiary sufficiency, we rehearse the facts in the light most compatible with the jury's verdict . . . ." Leftwich v. Maloney, 532 F.3d 20, 21 (1st Cir. 2008).

Near midnight on April 18, 2001, a Toyota Camry stopped in front of an apartment house in Brockton, Massachusetts. Three men got out of the car. Two of them entered the building while the third pressed the front buzzer. The third man then entered the

-3-

lobby, but the record is unclear as to whether he proceeded further.

Fitzroy Hecker and his girlfriend, Kerry Murphy, shared an apartment on the third floor of the building. Hecker sold marijuana from the apartment. Murphy was in the bedroom when she heard a voice (later identified as belonging to Damon Cannon) saying "I don't know, an ounce." She then heard someone with a deeper voice say either "[r]un him" or "[r]un it." According to evidence adduced at trial, these phrases indicated that the men were robbing Hecker.

Murphy soon heard three gunshots in rapid succession and, after a brief pause, a fourth shot. She went to the living room and saw a man sprinting into the common hallway while Cannon, with a look of shock on his face, stood still. After noticing Murphy, Cannon fled. He did not appear to be armed.

Hecker, who had been shot twice in the neck and once in the wrist, was bleeding profusely. His gun lay on the floor near his left hand.

A third-floor neighbor heard the gunshots and then heard two people running down the stairs, saying "[l]et's go, let's go." He next heard "a car screeching off." A second-floor tenant likewise heard two people running down the stairs immediately after hearing the gunshots.

Although first responders arrived promptly, their efforts failed to save Hecker. Uncontradicted medical evidence showed that his death was caused by gunshots to the neck, fired at close range.

Other evidence (including a DNA match) placed petitioner-appellant Corinthian Housen in the room and revealed that he had sustained a gunshot wound to his left hand. Several hours after the incident, the petitioner sought treatment at an emergency room. He lied both about his identity and about the origin of his injuries.

On January 10, 2003, a state grand jury indicted the petitioner on charges of, inter alia, murder and attempted armed robbery. The case was tried to a jury in Plymouth Superior Court. The Commonwealth argued that the petitioner and Cannon attempted to rob Hecker and that, when the robbery attempt soured, the petitioner shot Hecker while Cannon stood frozen in time.

Testifying in his own defense, the petitioner admitted that he went with Cannon and a third man, Leroy Drane, to purchase marijuana from the victim. The petitioner asserted that Hecker was standing in front of him when Hecker's facial expression changed and he (Hecker) reached into the couch and retrieved a gun. At that point, the petitioner turned to flee but Cannon, who was standing behind him, began firing at Hecker. One of the bullets struck the petitioner's hand, and he ran from the apartment. Cannon and Drane followed.

Drane did not testify.  Although the petitioner placed Drane in the room at the time of the murder, the neighbors' accounts indicated that only two men, not three, fled from the apartment after the shooting.

The trial justice instructed the jurors that they could find the petitioner guilty of first-degree murder either as a principal or as a joint venturer under a felony murder theory.  The jurors ultimately found the petitioner guilty of first-degree murder, but they did so through a general verdict without specifying whether the finding of guilt was as a principal or as a joint venturer.[1]

Following the imposition of a life sentence and other proceedings not relevant here, the SJC took up the petitioner's appeal.  He advanced several claims of error, including a claim of evidentiary insufficiency and a due process claim based on the Commonwealth's advocacy, albeit in different trials, of inconsistent theories about the identity of the shooter.  The SJC turned a deaf ear to the petitioner's importunings.  See Housen I, 940 N.E.2d at 447.

The petitioner repaired to the federal district court and sought habeas relief.  The district court denied the petition, see

---

[1] The jury simultaneously convicted the petitioner on the charge of attempted armed robbery.  That conviction has not been challenged in this habeas proceeding, and we do not refer to it further.

-6-

Housen v. Gelb (Housen II), No. 12-10623, 2013 WL 1694799, at *5 (D. Mass. Apr. 17, 2013), but granted a certificate of appealability on the evidentiary sufficiency and due process issues, see 28 U.S.C. § 2253(c).

## II. ANALYSIS

In this instance, the district court did not conduct an evidentiary hearing. Consequently, we review de novo its denial of habeas relief. See Lynch v. Ficco, 438 F.3d 35, 44 (1st Cir. 2006). In conducting this appraisal, we examine the petitioner's two claims of error sequentially.[2]

### A. Sufficiency of the Evidence.

The Supreme Court's opinion in Jackson, 443 U.S. at 319, supplies what is unarguably the clearly established federal law anent the petitioner's first claim of error. The SJC implicitly employed this standard; it cited one of its own prior opinions, which had adopted the holding in Jackson. See Housen I, 940 N.E.2d at 442 (citing Commonwealth v. Latimore, 393 N.E.2d 370, 374-75 (Mass. 1979)). Thus, "we can securely reason that in scouring the record for Latimore error and finding none the SJC effectively

_____

[2] There is a considerable cacophony in the briefs about whether the district court improperly applied 28 U.S.C. § 2254(e)(1) to the petitioner's evidentiary insufficiency claim. See Housen II, 2013 WL 1694799, at *4-5. This is a tempest in a teapot and we need not resolve it. The determination of evidentiary insufficiency presents a quintessentially legal question, and our review of the district court's judgment is de novo. See Leftwich, 532 F.3d at 23. In conducting that review, we rely upon our independent assessment of the state-court record.

answered the federal constitutional question." Leftwich, 532 F.3d at 24.

The petitioner does not dispute this point but, rather, challenges the SJC's application of the Jackson standard. He contends that the evidence was insufficient to sustain a conviction on a theory of principal liability or, put another way, to show that he shot Hecker.[3]

The petitioner's evidentiary sufficiency argument pivots on his assertion that the evidence did not show that only two men, rather than three, entered Hecker's apartment before the murder. This is important, he says, because there was no direct evidence that the petitioner pulled the trigger, and the Commonwealth's case for principal liability depended in material part on two facts: that only the petitioner and Cannon were with Hecker and that

---

[3] It may be that we do not have to resolve this contention. In Commonwealth v. Zanetti, 910 N.E.2d 869 (Mass. 2009), the SJC departed from its prior precedents and held that where, as here, a defendant is tried on theories of principal and joint venture liability and the jury returns a general verdict, it would no longer "examine the sufficiency of the evidence separately as to principal and joint venture liability." Id. at 884. In the petitioner's subsequent appeal, the SJC, citing Zanetti, stated that it did not need to determine whether there was sufficient evidence that the petitioner was the shooter; but it nonetheless proceeded to decide that question and found the evidence adequate to ground a finding of principal liability. See Housen I, 940 N.E.2d at 442.

Zanetti was decided some years after Hecker's murder and the petitioner's trial, but before the SJC heard the petitioner's direct appeal. Because the SJC's suggested application of Zanetti may be retroactive and therefore may evoke due process concerns, we think it best to meet the petitioner's sufficiency of the evidence argument head-on.

Cannon did not have a gun. If a third man (Drane) was present, Cannon's lack of a weapon would have much less significance.

The petitioner's reading of the record is overly optimistic. The record contains ample evidence to support an inference that only the petitioner and Cannon were in the room with Hecker at the time of the murder. Murphy heard only two voices in the living room and, within a matter of seconds after hearing the shots, saw only Cannon and one other man in the living room. Although Murphy could not identify the second man, the petitioner's blood was found in the room and, in any event, the petitioner admitted that he was there. The conclusion that Cannon and the petitioner were alone with Hecker is bolstered by the fact that the neighbors heard only two voices and two sets of footsteps running down the stairs. A rational trier of fact could easily conclude from this evidence that only two men had visited the apartment — and that those two men were Cannon and the petitioner.

Our holding that there was sufficient evidence to support the inference that only two visitors were in the living room is fatal to the petitioner's more general claim that the evidence was insufficient to prove that he was the shooter. Murphy testified that, immediately after the shooting, Cannon did not appear to have a gun. The jury could reasonably infer from this evidence that Cannon was not the shooter and, therefore, the petitioner must have

fired the shots.[4]  Cf. Leftwich, 532 F.3d at 26 ("This lack of any evidence pointing elsewhere bolstered the inference that it was the petitioner who slew the [victim].").

In an effort to blunt the force of this reasoning, the petitioner asserts that the SJC misstated the record when reviewing the evidence.  This assertion is fruitless: the facts that we have described, virtually all of which are uncontradicted, demonstrate the sufficiency of the evidence.  The supposed misstatements do not undermine that conclusion.

The petitioner makes a related argument.  Pointing to the uncertainty about how many people were in the apartment, he insists that where "the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction."  O'Laughlin v. O'Brien, 568 F.3d 287, 301 (1st Cir. 2009).  This is true as far as it goes — but it does not take the petitioner where he wants to go.  While the evidence may have permitted an inference that there were three visitors in the apartment, it was not equally supportive of that inference.  Moreover, the petitioner's argument blithely overlooks

_____

[4] The petitioner castigates the SJC for what he deems to be an overly speculative account of how the murder occurred.  See Petitioner's Br. at 26.  We do not need to enter this debate.  A blow-by-blow account of the murder is not necessary to conclude that there was sufficient evidence that the petitioner was the shooter.

the fact that we consider whether the evidence is in equipoise only _after_ we have drawn reasonable inferences in favor of the verdict. See, e.g., Magraw v. Roden, ___ F.3d ___, ___ (1st Cir. 2014) [No. 13-1483, slip op. at 7]; Morgan v. Dickhaut, 677 F.3d 39, 53-54 (1st Cir.), cert. denied, 133 S. Ct. 449 (2012).

Let us be perfectly clear. Measuring the sufficiency of the evidence in a circumstantial case is not an exact science. And in this case, the conclusion that the petitioner was the shooter is not ironclad. On review for evidentiary sufficiency, though, "a habeas court may not freely reweigh competing inferences but must accept those reasonable inferences that are most compatible with the jury's verdict." Magraw, ___ F.3d at ___ [slip op. at 11].

In a last-ditch endeavor to turn the tables, the petitioner directs our attention to the SJC's treatment of Cannon's direct appeal. See Commonwealth v. Cannon, 869 N.E.2d 594 (Mass. 2007). There, the SJC found the evidence insufficient to warrant a conclusion that Cannon was the shooter. See id. at 599. The court rested this finding in part on the likelihood that three men (other than Hecker) may have been in the apartment at the time of the murder. See id. at 599-600.

The decision in Cannon is of limited utility here. The petitioner and Cannon were tried separately, and the evidence introduced in the two trials was not identical. The proof that there were only two men running down the stairs after the shooting

-11-

appears to have been stronger in the petitioner's trial.  See id. at 598 & n.10.  Perhaps more important, the petitioner did not testify at Cannon's trial.  At his own trial, however, he not only testified but also identified Cannon as the shooter.  In light of that testimony, it strains credulity for him to argue, on this record, that the jury's finding is infirm because of the possibility that a third man might have wielded the weapon.

To say more about the Cannon opinion would be pointless. The sufficiency of the evidence in any given case must be tested against the record in that case.  In performing that analysis, "the minimum amount of evidence that the Due Process Clause requires . . . is purely a matter of federal law."  Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012) (per curiam).  That law is exemplified by Jackson and, reasonably applied, Jackson leads inexorably to the conclusion that the evidence presented in the petitioner's state-court trial was adequate to ground his conviction.

## B.  Prosecutorial Inconsistency.

The petitioner's second claim of error posits that the Commonwealth's inconsistent positions as to who shot the victim and the SJC's approval of the Commonwealth's tactics were "contrary to, or an unreasonable application of, clearly established Federal law as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  The petitioner asserts — and we agree — that, under clearly established law, a criminal defendant has a due process right to a fair trial.

-12-

See, e.g., Lisenba v. California, 314 U.S. 219, 236 (1941).  The Supreme Court has held that certain specific kinds of prosecutorial misconduct may abridge this fair-trial right.  See, e.g., Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that the prosecution's suppression of material evidence favorable to the accused, following defendant's request, violates due process); Napue v. Illinois, 360 U.S. 264, 272 (1959) (reversing when state used false testimony to secure conviction).  The petitioner invites us to glean from these precedents a general principle that "a defendant's due process right to a fair trial is violated when the prosecution engages in conduct that deceives or misleads a court and jury, or unfairly disadvantages the defendant in his defense."  Petitioner's Br. at 40.  Reminding us that "a federal court may grant relief when a state court has misapplied a governing legal principle to a set of facts different from those of the case in which the principle was announced," Wiggins v. Smith, 539 U.S. 510, 520 (2003) (internal quotation marks omitted), he suggests that the SJC's application of the fair-trial principle to the Commonwealth's prosecutorial tactic was objectively unreasonable.[5]

---

[5] The petitioner's brief is ambiguous as to whether his argument is that the SJC's decision was "contrary to" or "an unreasonable application of" federal law.  We think it plain, however, that the SJC's decision cannot be deemed contrary to federal law.  The SJC did not "appl[y] a rule that contradicts the governing law set forth" by the Supreme Court.  Williams v. Taylor, 529 U.S. 362, 405 (2000).  Nor did it "confront[] a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrive[] at a result different from

-13-

The district court dismissed this suggestion, holding that the petitioner could not meet the "clearly established" element of the section 2254(d)(1) test.  See Housen II, 2013 WL 1694799, at *5.  The court based its holding, in part, on the Supreme Court's decision in Bradshaw v. Stumpf, 545 U.S. 175 (2005), in which the Justices confronted a habeas petitioner's remarkably similar "assertions of inconsistency relate[d] . . . to the prosecutor's arguments about which of" two codefendants shot the victim, id. at 187.  There, the petitioner insisted that the prosecution's argument to his sentencing panel was inconsistent with its argument at his codefendant's trial and, therefore, rendered his death sentence unconstitutional.  See id. at 180-82. In response, the Court found it "at least arguable" that the prosecution's use of inconsistent theories was material to the sentence imposed.  Id. at 187.  But because the import of the alleged inconsistency was not clear, the Court reserved the hybrid question of "whether the prosecutor's actions amounted to a due process violation, or whether any such violation would have been prejudicial."  Id.  Consequently, the Court remanded the case for further consideration.[6]

_____

[the Court's] precedent."  Id. at 406.

[6] On remand, the Sixth Circuit held, in a divided opinion, that there was no due process violation.  See Stumpf v. Robinson, 722 F.3d 739, 749 (6th Cir. 2013) (en banc).

The district court concluded that Bradshaw "left open the question of whether the prosecution's use of inconsistent theories of responsibility for a crime may constitute a violation of due process." Housen II, 2013 WL 1694799, at *5. This circumstance, in the district court's view, foreclosed the petitioner's argument that the applicable law was clearly established. See id.

It is not transparently clear whether the Bradshaw Court intended to leave open the precise question limned by the district court. But we need not plunge into those murky waters. Consistent with the de novo standard of review, we are not wed to the reasoning of the court below but, rather, may affirm its decision on any ground made manifest by the record. See Pike v. Guarino, 492 F.3d 61, 71 (1st Cir. 2007). We choose to exercise that flexibility here.

We think that the simplest way to approach this claim of error is by gauging the reasonableness of the SJC's application of clearly established due process principles to the petitioner's prosecutorial inconsistency claim. The SJC implicitly acknowledged the viability of the petitioner's due process theory, see Housen I, 940 N.E.2d at 444 (reviewing and distinguishing cases addressing the inconsistent prosecution issue); considered whether the theory applied to the facts presented; and concluded that it did not, see id.

-15-

This multi-part determination was not unreasonable. After all, the Supreme Court has never held that the prosecution of different defendants in different trials on materially inconsistent theories of guilt violates due process when, as in this case, state law permits such a course of action. Here, moreover, two additional considerations weigh heavily in favor of a finding of reasonableness.

First, there is no indication that the prosecutorial inconsistency of which the petitioner complains persisted through the SJC's review of the petitioner's direct appeal. The SJC heard that appeal after it had held in a separate case that there was insufficient evidence to convict Cannon as the shooter, vacated Cannon's conviction, and remanded for trial on a theory of joint venture liability only. See Cannon, 869 N.E.2d at 605. Accordingly, any potential inconsistency in result between the two cases had been remedied by the time the SJC heard the petitioner's appeal.

Second, we disagree with the petitioner that the Commonwealth unfairly "manipulate[d] the evidence." Petitioner's Br. at 43. To the exact contrary, the record is barren of any hint of unfair manipulation. In this respect, the petitioner's case stands in sharp contrast to cases such as Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000), in which the court (applying pre-AEDPA standards) ruled that the prosecution's "zeal to obtain multiple

-16-

murder convictions on diametrically opposed testimony render[ed the petitioner's] convictions infirm." Id. at 1052. Here — unlike in Smith — the Commonwealth used mostly the same evidence in prosecuting both Cannon and the petitioner. Thus, it did not make use of "inherently factually contradictory theories." Id. Put bluntly, the Commonwealth relied throughout on the same nucleus of operative facts and merely argued for inconsistent inferences.

In upholding the SJC's determination, we stress that our narrow focus is on the objective reasonableness of that determination, given the factual record. This case does not require us to decide broadly whether or in what circumstances a state's prosecution of different individuals on inconsistent theories of guilt may violate due process, and we express no opinion on those questions.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, the judgment of the district court is

**Affirmed.**