# United States Court of Appeals
## For the First Circuit

No. 13-2438

KEITH WINFIELD,

Petitioner, Appellant,

v.

STEVEN J. O'BRIEN,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before

Howard and Kayatta, Circuit Judges,
and McCafferty,* District Judge.

Robert L. Sheketoff for appellant.
Kris C. Foster, Assistant Attorney General, Massachusetts,
with whom Martha Coakley, Attorney General, Massachusetts, was on
brief, for appellee.

December 18, 2014

---

*Of the District of New Hampshire, sitting by designation.

**KAYATTA, Circuit Judge**. This appeal illustrates both the considerable responsibility granted to a jury, and the restricted scope of federal court review of state court convictions. A heinous crime most certainly occurred. Less certain is the perpetrator's identity. No confession, eye-witness testimony, DNA, or similar evidence pointed the finger confidently at any one person. Rather, the direct evidence simply narrowed the list of suspects. A properly instructed Massachusetts Superior Court jury then found that the circumstantial evidence proved beyond a reasonable doubt that one of the suspects, Keith Winfield, committed the crimes. Now serving a life sentence for assaulting and raping a two-year-old child, Winfield filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254, seeking to invalidate his conviction on two grounds.

First, he claims that the evidence against him was so insufficient that no reasonable jurist could have concluded that a rational jury could have found him guilty beyond a reasonable doubt. Second, he claims that the state trial court's refusal to permit him to cross-examine the victim's mother about her potential bias arising from pending criminal charges against her constituted an unreasonable application of the clearly established Sixth Amendment confrontation right. The district court, concluding that the state courts' rejection of Winfield's claims did not constitute

-2-

an unreasonable application of federal law, denied the petition. We now affirm.

## I. Background

**A. Factual Summary**

The charges on which Winfield was convicted stemmed from the vaginal and anal rape of his two-year-old niece with a curling iron on October 13, 2005. We recount the evidence presented against Winfield largely as it was described in the opinion of the Massachusetts Appeals Court, supplementing that description, where appropriate, with other record facts consistent with the state court's findings. See, e.g., Lynch v. Ficco, 438 F.3d 35, 39 (1st Cir. 2006).

The victim, who was the daughter of Winfield's wife's sister, was born in 2003, and lived with her mother and maternal grandparents in Tewksbury, Massachusetts. In September 2005, the victim's mother, who was seeking employment, began leaving her daughter with Winfield's wife, Patricia, on those days when she was out looking for a job. Winfield and Patricia themselves had two daughters; at the time, one was four years old, and the other was eight months old. Winfield, Patricia, and their two daughters lived on the first floor of a two-family home in Melrose, Massachusetts.

On October 10, 2005, the victim's mother began a job as a radiology assistant in Burlington, Massachusetts. She arranged

-3-

to have Patricia provide regular daycare for the two-year-old victim beginning on October 11, 2005,[1] for approximately $150 per week. The victim's mother and Patricia arranged that the victim's mother would drop off the victim at Winfield's home on her way to work in the morning, and the victim's grandmother--the mother of both the victim's mother and Patricia--would pick up the victim at 3:00 p.m.

On Tuesday, October 11, 2005, the victim's mother returned home from work, and, upon changing her daughter's diapers, found bruises on her daughter's arms and legs. She nevertheless returned the victim to Patricia and Winfield's home the next day. That day, after work, she noticed additional bruising on her daughter's face, arms, and abdomen. The victim's mother called Patricia to inquire about the bruises, but both Patricia and Winfield, who was on leave from his job and would later report that he was home on that day, denied knowledge of them.

At the end of the following day, Wednesday, October 12, 2005, the victim's mother noticed more bruises on the victim's arms and stomach. The only evidence of who was with the victim that day (other than her mother) was contained in Winfield's statement to police detectives on November 7, 2005. In that statement, Winfield reported that he did not assist his wife in taking care of the

---

[1] On October 10, the victim's maternal grandmother babysat her.

victim that day. Rather, he slept late, then left for approximately four hours, returning just as the grandmother arrived to pick up the victim.

On the morning of Thursday, October 13, 2005, the victim's mother changed the victim's diaper before driving to Patricia's to drop the victim off. The victim's mother noticed nothing of concern in the victim's genital or anal area. She again dropped off the victim at the Winfield home, and went to work. Winfield was asleep when the victim was dropped off, but awoke between 10:30 to 11 a.m. Winfield's father and brother, who lived in the upstairs unit, were not home that day.

The victim's mother testified that over the course of that day, she called Winfield's home from work at least three-to-four times. The first call, which went unanswered, was at 12:40 p.m. She called a second time, at 12:55 p.m., and Winfield answered. When the victim's mother asked where Patricia was, Winfield informed her that Patricia had gone to get coffee and would be home soon. When the victim's mother asked where her daughter was, Winfield replied that she was in front of him playing with his younger daughter and a toy. The victim's mother asked to speak to her daughter, and Winfield stated that he was putting her on the telephone. The victim's mother then spoke into the telephone to her daughter for "about twenty minutes," but her

daughter was not responsive.  The mother's testimony at trial suggested that this was unusual.

The victim's mother called a third time, immediately after hanging up, but the line was busy.  The final call took place at 1:17 p.m., and Winfield answered the telephone.  When the victim's mother asked Winfield if her daughter was okay, the defendant replied that she was fine and "was just sitting and playing."

When the grandmother arrived at Winfield's home to pick up the victim that afternoon, Winfield and Patricia were both at home, and the victim was sleeping.  After a few minutes, the victim awoke and ran to her grandmother, crying.  As they went to the car, the grandmother tried to get the victim to walk, but she refused, and continued to cry.  As an explanation, Winfield offered only "maybe her legs are still asleep."  The victim continued to cry all the way to Tewksbury.  Once inside the Tewksbury house, the grandmother changed the victim's diaper, and noticed that her vaginal area was red and puffy.[2]

That evening, the victim's mother changed the victim's diaper at 8:00 p.m., and the victim cried and appeared to be in pain.  The victim's vaginal and anal areas were very red.  The

---

[2] Crediting the grandmother's testimony limits the window during which the crime could have been perpetrated to the time between the victim being dropped off at the Winfield home and the time the grandmother picked her up. Winfield does not argue that the grandmother's testimony should not be credited.

-6-

victim continued to cry, but eventually fell asleep, around 9:00 p.m. Around 11:00 p.m., the victim woke up and said she needed a diaper change. The mother again changed the victim's diaper, this time noticing that the victim's genital and anal areas were bleeding, and that the skin in those areas was blistering. The victim cried during the change, but soon fell back asleep.

The next morning, the mother took the victim to a medical office in Somerville, Massachusetts, where Dr. Carole Allen, the director of pediatrics, examined the victim. The victim's vaginal area was blistered, her anal area was red, and she appeared to be in pain. After consulting with the victim's primary care physician, Dr. Allen formed the opinion that the victim had been raped.

At Dr. Allen's suggestion, the mother took the victim to Children's Hospital, where the victim was seen at approximately 10:30 p.m. by a team of physicians that included Dr. Alice Newton, the medical director of the child protection team at Children's Hospital. The team examined and photographed the victim, and determined that there were second- and third-degree burns on the victim's genitals and anus. The victim's labia majora and the structure inside it were red and blistered. Also red, blistered, and peeling was a four- to five-centimeter area around the victim's anus. Internal examination revealed that the burns extended almost an inch inside the victim's anus, and that there were three tears

from stretching of the anal tissue. The doctors concluded that these injuries indicated impalement by a hot, cylindrical instrument. In addition, they observed bruises on the victim's left jaw, her forehead, her cheek, her chest, and her right nipple. Dr. Newton opined at trial that the vaginal and anal burns were intentionally inflicted, with a cylindrical instrument such as a curling iron, between twenty-four and thirty-six hours before she examined the victim at approximately midnight on October 14--i.e., between noon and midnight on Thursday, October 13, the last day the child was at Winfield's home.

A CAT scan of the victim, taken on October 15, 2005, at 1:00 p.m., revealed that the victim also had a large skull fracture on the rear left side of her head, with internal bleeding near her brain. Newton opined that the cause of such an injury must have been a traumatic event, but that she could not say whether the injury was accidental or purposefully inflicted. She opined that the injury was sustained within three days of the CAT scan.

A skeletal survey also conducted on the 15th revealed a healing fracture of the radius in the victim's left wrist. Dr. Newton opined that the injury could have been accidental or inflicted, but would have generated pain. Newton observed, based on the healing of the injury, that the wrist fracture was at least seven days, and not more than a month, old. The survey also

revealed healing fractures in the fourth and fifth ribs. Newton opined that these injuries raised the concern of inflicted injury.

On the evening of October 14, 2005, an emergency response worker from the Department of Children and Families and a Melrose police detective went to Winfield's home to check on his children. Winfield was at work, but he met the following day at his home with the emergency response worker and Melrose police detective Mark Antonangeli. Accompanied by Patricia, Winfield stated that he was home October 11th through 13th, 2005, while his wife was babysitting the victim, and that he and his wife were the only caretakers of the victim during the time she was at their house on those days. He further stated that he changed the victim's diaper once, on Thursday, October 13, and that as he changed the diaper, he noticed that the victim's vaginal area was swollen, and he called his wife to look at it. He said that they had concluded that the victim had a bad diaper rash. He also stated that at some point that day he heard the victim crying; he then discovered her on the floor and assumed that she fell off the bed. When Patricia said she had gone out with their four-year-old daughter for forty-five minutes to one hour, the petitioner agreed.

On November 7, 2005, Winfield, accompanied by counsel, waived his Miranda rights and was interviewed by police at the

station.[3]  A redacted version of his statement was played for the jury.  During his statement, he said that on October 13, 2005, he was at home, there were no visitors at the home, his father and brother were at work, and he was alone with the victim and his eight-month-old daughter for between forty-five minutes and one hour during the middle of the day.  He further stated that when the victim's mother called midday on October 13, and he gave the phone to the victim, she responded on the phone verbally, saying "Momma, Momma," and other words he could not recall.  He added that he did not get along well with the victim's mother, and that he had not been in favor of taking on another child.

## B.  Procedural History

In August 2006, a Middlesex County grand jury indicted Winfield on two counts of Rape of Child, see MASS. GEN. LAWS ch. 265, § 22A, Indecent Assault and Battery on Child Under the Age of Fourteen, see id. § 13B, and Assault and Battery by Means of a Dangerous Weapon Causing Serious Bodily Injury, see id. § 15A(c)(I).  At trial, he timely moved for a required finding of not guilty.  The judge denied his motion.  On the second day of deliberations, the jury returned guilty verdicts on all charges. Winfield received concurrent life sentences on both rape charges,

---

[3] Winfield's wife, Patricia, had spoken with police at the station on October 29.  She was accompanied by the same attorney who would accompany Winfield on November 7.

and concurrent nine-to-ten year sentences on the remaining two convictions.

Winfield timely appealed to the Massachusetts Appeals Court, arguing, inter alia, that the trial court erred by denying his motion for a required finding of not guilty at the close of the Commonwealth's case, and by refusing to allow him to impeach the victim's mother for bias stemming from her pending criminal charges. After briefing and oral argument, the Appeals Court affirmed his convictions. See Commonwealth v. Winfield, 76 Mass. App. Ct. 716 (2010). In rejecting his sufficiency claim, it reasoned as follows:

> The main evidence presented against the defendant was the medical evidence and the defendant's recorded police interview. From the medical evidence, the jury could have concluded that the burns and skull fracture of the victim were inflicted shortly after midday on October 13, 2005, and that the victim would have cried aloud as she suffered the injuries. The jury could also infer that, because the victim would have cried aloud, the injuries were inflicted at a time when no one was around to hear the victim's cries. Moreover, from the defendant's prior recorded statements to the police, the jury were aware that, on the day the injuries were inflicted, the defendant was at home during midday with only the victim and his eight month old daughter. Therefore, the defendant was the only adult who had access to the victim during the time span in which the injuries occurred.
>
> In addition to having access to the victim, the defendant had the means to commit the crimes. In the bathroom of the defendant's home was a small curling iron. After viewing photographs of the victim's injuries, the jury could find that the pattern of the burns to the victim's anus were consistent with having been inflicted by a hot instrument the same shape and size of a small curling iron.

-11-

Finally, the jury could consider the fact that the defendant, and not his wife, had expressed displeasure over the presence of the victim in his home. In his recorded interview, the defendant stated that he never wanted his wife to care for the victim. While such evidence is insufficient to establish motive, the jury could infer the defendant's hostility toward the victim, which is relevant to motive. There was no evidence that such hostility was shared by his wife.

. . .

In sum, the judge correctly ruled that the evidence, viewed in the light most favorable to the Commonwealth, permitted a rational trier of fact to find the defendant guilty of the indictments.

Id. at 722-23 (footnotes omitted).

Winfield sought further appellate review from the Massachusetts Supreme Judicial Court. After his application was denied, see Commonwealth v. Winfield, 457 Mass. 1108 (2010), he timely filed this petition for a writ of habeas corpus in the United States District Court for the District of Massachusetts. The district court denied his petition, but issued a Certificate of Appealability as to both issues. Winfield appealed. We have jurisdiction pursuant to 28 U.S.C. § 2253(a).

## II. Analysis

### A. Sufficiency of the Evidence

In seeking to set aside a verdict under the federal Constitution for lack of sufficient proof, Winfield needed to convince the Massachusetts courts that, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond

-12-

a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Magraw v. Roden, 743 F.3d 1, 4 (1st Cir. 2014). This standard "exhibits great respect for the jury's verdict," Magraw, 743 F.3d at 4, but nevertheless does not insulate such a verdict from reversal if based on "evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." Id. (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)).

With the Massachusetts courts having rejected Winfield's direct appeal by concluding that the jury verdict was based on sufficient evidence, this collateral attack seeking a writ of habeas corpus from a federal court provides Winfield with a second, more limited opportunity to set aside the jury's verdict. As constrained by the Antiterrorism and Effective Death Penalty Act ("AEDPA")[4], our collateral federal review is limited to determining whether the state courts' decision finding the evidence constitutionally sufficient "was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). In other words, we do not ask, as we might on direct review of a conviction in federal court, whether the evidence was constitutionally sufficient. We ask, instead, whether the state

_____

[4] See Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1218-1219, codified at 28 U.S.C. § 2254.

courts' ruling that the evidence is constitutionally sufficient was itself "unreasonable." Id.[5] "Unreasonable" in this context means that the decision "evinces some increment of incorrectness beyond mere error." Leftwich v. Maloney, 532 F.3d 20, 23 (1st Cir. 2008); see generally Hurtado v. Tucker, 245 F.3d 7, 16 (1st Cir. 2001) ("Habeas review involves the layering of two standards. The habeas question of whether the state court decision is objectively unreasonable is layered on top of the underlying standard governing the constitutional right asserted."). The resulting test raises a high bar, but it is nevertheless a bar that can be met. See O'Laughlin v. O'Brien, 568 F.3d 287, 304 (1st Cir. 2009) (acknowledging the "extremely high bar that must be overcome on habeas review to overturn a state court decision," but finding the bar met).

Demonstrating a refined understanding of the limited scope of our review--a scope reflective not only of statutory requirements, but of our respect for the jury's role and our deference to the state courts' consideration of Winfield's challenge--Winfield joins issue only on the narrow question of whether the evidence presented at trial was sufficient to permit a reasonable jurist to conclude that a rational jury could have found beyond a reasonable doubt that it was Winfield, rather than his

---

[5] We answer this question de novo, without deference to the decision of the district court. Pena v. Dickhaut, 736 F.3d 600, 603 (1st Cir. 2013).

-14-

wife Patricia, who committed the crime. And even without Winfield's well-advised implicit concession, the assumption we must make that the jury believed the testimony of the mother and grandmother, together with the expert evidence, does indeed mean that we need presume that either Winfield, his wife or both must have committed the charged crime. We therefore train our review on Winfield's key argument that "[w]hatever reason the prosecution had for blaming [the defendant] rather than his wife, assuming there was one, never made it into evidence before the jury."

Notionally, Winfield is correct that evidence sufficient only to establish with nearly equal likelihood that A or B committed a crime cannot support a verdict against either. "[I]f the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction." O'Laughlin, 568 F.3d at 301 (quoting United States v. Flores-Rivera, 56 F.3d 319, 323 (1st Cir. 1995)). The rationale for this rule is simple: A criminal trial ought not be an arbitrary exercise, and "where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury must necessarily entertain a reasonable doubt." Id. (emphasis omitted).

There is some question whether this rule we have recognized applies as a law "determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In other words, is it a simple rewording of the Jackson standard, or is it a circuit level added refinement? See Glebe v. Frost, 135 S.Ct. 429, 430 (2014); White v. Woodall, 134 S.Ct. 1697, 1702 (2014). Jackson after all included the statement that "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. Ultimately, we need not decide whether evidentiary equipoise precludes collateral reversal of a guilty verdict because, viewed reasonably as a rational jury may have viewed it, the evidence did not point with nearly equal force at both Winfield and his wife. Most notably, only Winfield was left alone in the apartment with the two-year-old victim and the infant on October 13, 2005. He therefore had a materially greater opportunity to commit the offense without detection.

Winfield does offer a two-part rejoinder to the observation that he had a materially greater opportunity to commit the crime. He points first to his statement that he was asleep until 10:30 or 11:00 that morning. He points second to the possibility that the perpetrator muffled the victim's cries while

assaulting the child, thus perhaps explaining some of the bruises. The Massachusetts courts were unconvinced that the countervailing force of this rejoinder was sufficient to restore equilibrium in the directional thrust of the circumstantial evidence. Reason is not to the contrary. The home was a single floor unit with two bedrooms, a living room, a kitchen, and a single bathroom. Any opportunity to commit the crime without notice by Winfield, even if thought to be still sleeping, or by the four-year-old, could reasonably be viewed as markedly less than the opportunity to commit the crime undetected after both the other adult and the four-year-old left the apartment. And the fact that the doctor's estimated range of the time of injury commenced at noon, after he awoke, tilted the evidence in the same direction.[6] In a different but also probative manner, the conflicting testimony by the mother and Winfield regarding whether the child was responsive on the phone created further cause to call into question Winfield's version of events that day.

There is also the evidence that, after the state intervened, Winfield reported that he had noticed a "bad diaper rash" on the day in question, and that the victim fell out of bed. Yet there is no evidence that he reported such facts on the day in

---

[6] The mother's phone call did, we note, interrupt by 20 minutes Winfield's 45-60 minute window alone with the victim. It still left a window of opportunity that was greater for him than for his wife.

question, even when the victim was crying and limp when the grandmother picked her up.

We do observe that, if Winfield's statement to police--that he was out for four hours and did not watch the victim on Wednesday, October 12--were believed, it would follow that he had no time alone with the victim on Wednesday, while his wife did, and new bruises were detected at the end of that day. It is not unreasonable to think, though, that a rational jury could have discounted Winfield's version of events. And even if not, a jury was not compelled to find that the source of the bruises (a fall perhaps?) was identical to the source of the vaginal and anal injuries. More generally, the logical choices here were not limited to either Winfield alone, or his wife alone. A third choice was both. So the contention that logic pointed unerringly to Winfield's guilt or innocence in equipoise is not correct.

Winfield notes that his wife never testified, and therefore never denied the crime, while the jury heard Winfield's recorded statement in which he denied the crime. The absence of the wife's appearance as a witness is puzzling. Apparently both sides concluded that there was more to lose in calling her. In any event, given the foregoing evidence pointing more towards Winfield, we cannot say that the absence of testimony by the wife rendered the evidence so clearly insufficient that a finding of guilt would represent an "increment of incorrectness beyond mere error."

Leftwich, 532 F.3d at 23. "The prosecution may prove its case by circumstantial evidence, and it need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt." United States v. Brown, 603 F.2d 1022, 1025 (1st Cir. 1979)(citations omitted); see also Stewart v. Coalter, 48 F.3d 610, 615-16 (1st Cir. 1995) ("Guilt beyond a reasonable doubt cannot be premised on pure conjecture. But a conjecture consistent with the evidence becomes less and less a conjecture, and moves gradually toward proof, as alternative innocent explanations are discarded or made less likely.").

We need not consider whether the additional evidence on which the state courts relied--for example, Winfield's access to a curling iron (which would seem to have been equally available to his wife), or his rather innocuous statement that he did not want to have the victim at his home--were sufficiently illuminating to lend further legitimacy to the verdict. "[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require . . . an opinion from the state court explaining [its] reasoning." Harrington v. Richter, 131 S. Ct. 770, 784 (2011). Nor need we ignore the difficulty of assuming that rational reasoning played any role in the decision to commit the crime (or in much of the behavior leading up to October 13). Certainly a rational jury could have acquitted Winfield. The

question at this stage of review, though, is whether the state courts could reasonably conclude that, where Winfield's opportunity to commit the offense was materially, albeit marginally, greater than that of the only other possible perpetrator[7], and where the expert evidence and the phone call cast heightened relevant focus on the time when he was alone with the child, a rational jury could conclude beyond a reasonable doubt that he was the perpetrator. For the foregoing reasons, we must answer "yes."

**B. Scope of Cross-Examination**

Prior to trial, the state lodged a criminal complaint against the victim's mother, charging her with 25 counts of uttering a false prescription for a controlled substance. Winfield sought to cross-examine the victim's mother on that criminal complaint, so that he could raise an inference that her testimony was influenced by the government, which plainly had leverage over her. And because her testimony was important in establishing the window within which the crime occurred, proof of any such bias infecting that testimony would have been quite helpful to the defense. The trial court precluded Winfield from this line of examination, and the appeals court affirmed that ruling.

Our review of Winfield's collateral challenge to that ruling is analogous to that review employed in our sufficiency

---

[7] Assuming, as we must, that the jury believed the testimony of the victim's mother and grandmother.

analysis. We employ the standard governing the constitutional right asserted (here the Sixth Amendment right of confrontation), but we do so only for the purpose of determining whether the state court decision rejecting Winfield's assertion of that right was contrary to, or an unreasonable application of, the law as clearly established by Supreme Court precedent.

An "essential constitutional right for a fair trial," the right of cross examination is nevertheless "subject to 'reasonable limits' reflecting concerns such as prejudice, confusion or delay incident to 'marginally relevant' evidence." White, 399 F.3d at 24 (quoting Delaware v. Van Arsdell, 475 U.S. 673, 678-79 (1986)). A challenge to an exclusion of evidence on cross examination based on those limits "is tenable only where the restriction is manifestly unreasonable or overbroad." Ellsworth v. Warden, 333 F.3d 1, 7 (1st Cir. 2003) (en banc).

The problem for Winfield here is that the criminal charges against the victim's mother were lodged well over a year after the she gave her statements to police and child welfare officials, and long after her subsequent grand jury testimony. Her trial testimony, in turn, was entirely consistent in material respects with those prior statements and testimony. Therefore, the premise that the testimony was crafted in part as a result of the intervening criminal charges was not plausible. At most, one might

-21-

speculate that the charges reduced the likelihood that she would recant her earlier pronouncements.

Winfield points to no case holding that the exclusion of evidence having such a logically attenuated ability to imply bias is unreasonable. He points instead to Davis v. Alaska, 415 U.S. 308 (1974). In Davis, though, the proffered evidence was that a crucial eye witness was on probation for burglary both at the time of his initial statement and at the time of trial. In short, the fact proffered as a source of bias--the probation--was operative at all times when the inculpatory evidence helping the state was tendered. Id. at 310-11.

We observe, too, that precluding Winfield from cross-examining on these pending criminal charges, even if marginally probative of bias, was like denying someone a cap gun when he has a bazooka handy. When a child is discovered to have numerous unexplained injuries that apparently went unaddressed for some time, the mother has ample motive to deflect the blame towards someone else. And there is no claim that the trial court restricted Winfield from cross-examining on testimonial bias arising from that motive.

For these reasons, we cannot say that the state court's exclusion of evidence about the victim's mother's pending criminal charges was an unreasonable application of law clearly established by Supreme Court precedent.

### III.  Conclusion

We have reviewed the record in this troubling case.  Our authority in so doing is limited. We cannot ask whether we would have voted for conviction.  Nor can we even ask whether we would have sustained the conviction on direct review.  Instead, Congress has limited our collateral review to asking whether Massachusetts courts could have reasonably concluded that a rational jury could have found Winfield guilty beyond a reasonable doubt.  Finding that they could have, we must <u>affirm</u> the district court's order denying Winfield's petition.  <u>So ordered</u>.